[No. F054353. Fifth Dist. May 21, 2008.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
ISAAC BROOKS MERAZ, Real Party in Interest.

COUNSEL

Phillip J. Cline, District Attorney, Don Gallian and William Yoshimoto, Assistant District Attorneys, and Barbara J. Greaver, Deputy District Attorney, for Petitioner.

No appearance for Respondent.

Michael B. Sheltzer, Public Defender, Lisa J. Bertolino, Assistant Public Defender, and David F. Rendahl, Deputy Public Defender, for Real Party in Interest.

OPINION

**ARDAIZ, P. J.**—A defendant in a capital murder case seeks to discover information concerning a vehicle stop and in-field showup made in the vicinity of, and shortly after, the homicide. He further seeks to discover a police report concerning the initial interview of eyewitnesses to the shooting. The witness interview report cannot be located, and the officer who conducted the interview has passed away. Further, the prosecutor repeatedly, but, unbeknown to him, incorrectly, represents that no reports concerning the traffic stop exist. During jury selection, the prosecutor learns that field interview (FI) cards and photographs related to the vehicle stop have been found in possession of the police department that investigated the fatal shooting. Although the prosecutor immediately discloses the information to the defense and the trial court questions its exculpatory value, the court finds it appropriate to impose a sanction to ensure such untimely disclosure by law enforcement will not happen again. Accordingly, it dismisses the special circumstance allegation.

In this case of first impression, we hold that a trial court's power to impose partial dismissal as a sanction for a discovery violation is subject to the same limitation as its power to dismiss an entire charge as a sanction: it cannot do so unless dismissal is *required* by the Constitution of the United States. Since the federal Constitution does not require dismissal here, the trial court's imposition of the ultimate sanction was improper. Accordingly, we will grant the People's request for relief. In so doing, however, we commend the trial court for acting to ensure this type of situation does not recur, and we express no opinion concerning what, if any, sanctions may ultimately be appropriate under the circumstances of the case.

## FACTS AND PROCEDURAL HISTORY

### I

#### THE SHOOTING

Just after midnight on August 23, 2003, Jorge Landin and his brother, Jose, were with several other people in a car driven by Jose. The Landin brothers were Surenos, and Jose was wearing a blue shirt that said "sur" on it. As they waited in line at the drive-through window of the Jack in the Box on Mooney Boulevard in Visalia, someone ran up, said, " 'Fucking scraps' " (an insult to Surenos), and fired multiple shots through the open passenger window of the car. Jose Landin was struck three times and bled to death from a gunshot wound to the neck.

Between 12:30 and 1:00 a.m., real party in interest Isaac Brooks Meraz showed up at the residence of Brandi Shipman and said he needed somewhere to stay. He was shaking and upset and said he had shot somebody. He said the victim was in the drive-through, and Meraz walked up and shot him, then ran. Meraz said he got back in the car and came to Shipman's home. Meraz's gun was hidden by Shipman's trailer that night.

Although the record does not reveal the date or circumstances of Meraz's arrest for the shooting, a complaint was filed against him on August 27, 2003, and, following a preliminary hearing on December 3, 2003, he was held to answer. On March 10, 2004, a second amended information was filed in Tulare County Superior Court, charging Meraz with, inter alia, murder committed by an active participant in a criminal street gang to further the activities of that gang (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(22)). The People elected to seek the death penalty.

### II

#### THE DISCOVERY VIOLATION

According to Detective Wright's report, he interviewed Rick and Adam Joy shortly after the shooting. The Joys, who said they had been interviewed in detail by Officer Bernasconi prior to Wright's arrival, related to Wright that they were in the vehicle directly behind Jose Landin's car at the Jack in the Box. Rick Joy described the vehicle involved in the shooting as a 1963 or 1964 blue Chevrolet Impala four-door, with a lowered back end and skinny tires. He tried to follow it, but got caught in traffic as the vehicle was

---

[1] All statutory references are to the Penal Code unless otherwise stated.

southbound on Mooney. Adam Joy described the suspect vehicle as a light blue 1960's Chevrolet Impala. He believed it was lowered, and had small tires and a custom paint job. Both men described the shooter, but neither believed he would be able to identify this person. Wright's report related that he released the Joys to leave after taking brief statements from them, and referred to Bernasconi's supplemental report for a further detailed statement.

A transcript of police radio traffic following the shooting showed the broadcast of a description of the suspect vehicle as a lowered, possibly 1980's model blue Impala with small tires, southbound on Mooney Boulevard. Officers subsequently stopped a blue Caprice, with spoke rims and a body style like an Impala SS, going southbound on Mooney. Officers broadcast that the occupants were two Hispanic males and two Hispanic females, and gave a general description of the males. There was reference to an officer photographing the two men.

Officer Carsten's report related that, at approximately 1:45 a.m. on August 23, Officer Canto informed him that he had stopped a vehicle matching the suspect vehicle description, at Mooney and Beech. Canto further advised that one of the passengers matched the suspect's description. Tabitha Price, who had been a passenger in Jose Landin's vehicle at the time of the shooting, was taken to the location of the stop by Officer Alfano for an in-field showup. Upon her return to Carsten's location, Price informed Carsten that she did not recognize either of the subjects as being involved at the Jack in the Box. Price stated she was unsure and could not offer any further information.

According to Sergeant Puder's report, he and Detective Shear interviewed Lee Mines, who had been present at the Jack in the Box during the shooting, on the night of August 27, 2003. Mines related that he recalled seeing a blue Chevrolet Caprice, 1976 or 1977, with Dayton rims. He felt the individuals in the vehicle might be involved, as the vehicle seemed to be in a hurry to leave the parking lot. Mines said he did not get a good look at the vehicle's occupants, but believed they were Hispanic males.

On September 17, 2004, July 11, 2005, and February 7, 2007, defense counsel made written informal requests for, inter alia, "all reports concerning the traffic stop and detention by Officer E. Cantu [sic] and the field identification of vehicle occupants by Officer Dirk Alfano as referred to in Officer Carsten's report dated 8/23/03."[2] On February 8, 2007, the prosecutor responded that he had forwarded the discovery requests to his law clerk and investigator for followup, but that his notes showed Canto previously indicated he did not memorialize the traffic stop. On February 20, 2007, the

---

[2] In addition, on February 10, 2006, counsel requested an updated delivery status on the items.

prosecutor further informed defense counsel that the People were not aware of any reports concerning the traffic stop, detention, and field identification.

On April 2, 2007, the defense made an informal request for any photographs taken during the stop of the Chevrolet. That same day, the prosecutor transmitted the request to Ginger Jarvis of the Visalia Police Department (VPD). On April 9, someone on behalf of VPD responded that they were sending two CD's of photographs the prosecutor apparently did not have, although none were of the vehicle stop. It was represented that the prosecutor should now have all of the photographs VPD had on file. On May 18, 2007, the prosecutor again requested the photographs from the vehicle stop.

On July 13, 2007, defense counsel informally requested all reports concerning Officer Bernasconi's detailed interview of Rick and Adam Joy, as referred to in Detective Wright's report. Officer Brown, who was assigned to complete the prosecutor's resultant request to VPD, subsequently reported that he was unable to locate any reports by Officer Bernasconi. Brown noted that the Joys were interviewed at the scene by Detective Wright, and that often, the initial responding officers obtain what is needed to provide officer safety information to responding units, with the primary interviews then done by the detectives. Brown admitted it was unknown whether that was what occurred in the instant matter. He further related that Bernasconi passed away in 2006, so no further information about the conversation could be obtained.

On October 31, 2007, near the conclusion of jury voir dire, the prosecutor advised defense counsel and the trial court that, during a conversation with Officer Canto about when he would be needed to testify, Canto stated that he thought he did document something with respect to the traffic stop. That morning, Canto informed the prosecutor that he had found some FI card information. The prosecutor had it retrieved and turned over to defense counsel that same morning. Defense counsel represented that he had been given the names, dates of birth, Social Security numbers, and prior law enforcement contacts of the vehicle's occupants, and that this had a significant impact on defense strategy.

Describing the lack of a formal report regarding the stop as "amazingly incompetent," the trial court asked defense counsel what he wanted. Counsel promptly moved for dismissal of the entire case for violation of *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*). The court responded that it thought dismissal was an excessive penalty, although it stated, "This is pretty major." When it asked defense counsel what he believed would be appropriate short of dismissal, counsel responded that he absolutely could not go forward with trial at that point, and that the district attorney should dismiss the special circumstance allegation. The prosecutor

argued that dismissal was not warranted, but represented he would make further requests of Canto and Alfano to prepare formal reports, and would have his investigator try to contact the vehicle's occupants.

Ultimately, it was decided the court would release the jury that was in the process of being selected, and would hold a hearing with respect to sanctions. The court stated it was not finding a *Brady* violation and was not going to dismiss the case. It noted, however, that the FI cards indicated they were given to supervising officers in 2003; although Tabitha Price could not positively identify the vehicle's occupants, she similarly (according to defense counsel) could not positively identify Meraz as the shooter; one of the vehicle's occupants was a Norteno, while the victim was a Sureno; and both parties, especially the defense, needed to conduct further investigation, but the defense had been denied that opportunity by the late discovery. The matter was then set for further hearing.

On November 9, defense counsel filed a written motion to dismiss. Counsel asserted that information regarding the vehicle was extremely significant and had been sought for several years by the defense, which had finally managed to track the vehicle, but could not identify or locate the occupants. The FI evidence was not disclosed until the day before final jury selection and opening statements were to take place, despite the fact it bore the notation that it had been forwarded to supervising VPD officers on August 29, 2003. Counsel argued the evidence was withheld, albeit inadvertently, from the defense; the evidence was favorable to the defense in that it contained potentially highly exculpatory information; and Meraz had suffered irreparable harm in that he had been denied the opportunity to investigate the new information in a timely manner, and because the new evidence materially changed his defense. Defense counsel concluded the only proper remedy was dismissal of the case. In his written opposition, the prosecutor argued the People had been diligent in providing discovery. He also asserted the new information was not exculpatory, because the stopped vehicle did not match the description of the shooter's car given by various eyewitnesses; had it been the correct vehicle, the Joys would have seen the stop instead of losing the shooter's car; and Brandi Shipman told police Meraz confessed to her. Last, the prosecutor argued sanctions were inappropriate, and that the proper remedy was to afford the defense a continuance as necessary to meet the evidence.[3]

---

[3] Both parties also addressed whether Bernasconi's report of his interview with the Joys was destroyed in violation of *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528]. As the trial court found no such violation and the claim is not raised in the proceedings now before us, we do not discuss it.

## III

<u>THE EVIDENTIARY HEARING AND IMPOSITION OF SANCTIONS</u>

An evidentiary hearing was held on November 19, 2007. We summarize the testimony presented by each witness at that hearing.

### Detective Shear

In 2003, Steven Shear was an agent (since retired) in VPD's violent crimes unit, and the lead investigating officer on this case. During his investigation, he was looking for a 1963 or 1964 or early 1960's green or blue Chevrolet Impala Caprice that was described as being lowered, with chrome rims and possibly some primer spots on it. He had a flyer produced to that effect and distributed to VPD's patrol units and other agencies. The description was also put out over the CLETS (California Law Enforcement Telecommunications System) network. Shear obtained some of the description from people who were at the hospital to which the victim was taken, while some of it was received in consultation with the other detectives who had been interviewing witnesses or who had consulted with other officers at the scene. Shear did not recall whether he spoke to Officer Bernasconi. He never had any information about a 1990's Caprice being involved in the incident.[4]

Shear acknowledged that, as lead investigator, he should have been aware of the report documenting the traffic stop and that a witness had been transported to the scene of that stop. He knew nothing about the FI, although the police report should have clued him to the existence of the FI cards. He first became aware of those cards on October 31, 2007, when the prosecutor informed him of their possible existence and asked him to try to find them. Shear contacted VPD, conducted a search, and found an FI card that had been completed by Canto approximately an hour before Shear was called to respond to the shooting scene. Shear obtained copies of the cards and photographs within approximately two hours of the prosecutor's request to him.

Shear's understanding of VPD's protocol was that when discovery requests are generated through the district attorney's office, they go to VPD's "DA liaison," who then assigns the requests to the various units that may be able to provide the information. The investigating officer will not necessarily see the request. A request for a specific report by a specific officer on a specific

---

[4] The prosecutor represented that it was Bernasconi who broadcast the description of the suspect vehicle as a lowered, possibly 1980's model blue Impala with small tires, southbound on Mooney. The FI card reported that the vehicle stopped was a blue 1993 Chevrolet Caprice.

incident would go to the records division, which maintains the files. Reports should all be contained in the original file; however, an FI card such as was completed by Officer Canto is not placed in the reports, but instead is placed in an FI file. The original is given to VPD's crime analysis unit and entered into a computer based on the name of the person who was "FI'ed," the date, and the time.

At the time of the shooting, then-Sergeant Puder was in charge of the violent crimes unit. Since the FI document said a copy was sent to him, standard procedure would have been for the FI's to be forwarded to the unit with responsibility for any case referenced. Assuming Puder received the FI's, he should have looked at them and consulted Shear concerning their relevance.

Shear was not involved in any discovery requests prior to October 31, 2007. If he had received a request worded as those made by the defense in this case, he would have gone to the FI files because of the reference to a field identification of the vehicle. He would also have had Canto complete a report on the incident if Canto had not already done so. Once he learned of the requests from the district attorney's office, he attempted to determine who had handled them and said no information existed. He believed it was VPD's DA liaison, Ginger Jarvis. He did not question her about it, as she had retired.

*Officer Canto*

After the shooting, Officer Canto was patrolling the area of the crime scene for witnesses or suspects, when he was directed to stop a vehicle that matched the description of the suspect vehicle. Canto initiated a traffic stop in the parking lot of Bank of the Sierra, just south of Mooney and Walnut. The purpose of the stop, which occurred about 40 minutes after the shooting, was to determine if this was a possible suspect vehicle in the crime. The vehicle stopped was consistent with the BOL (be on the lookout) description Canto had received.[5]

The car contained two males and two females. Canto and Officer Alfano, who was in a separate marked unit, made contact with the subjects. As there was nothing to tell the officers whether these were possible suspects, they arranged to conduct an in-field showup. Alfano brought a witness to the scene, but the witness was unable to identify anyone. Based on that, the

---

[5] The broadcast description was of a possible 1980's model Impala with up to five subjects in it. This car was a 1990's model containing four people, which was consistent enough to warrant a stop.

officers completed FI cards, took photographs, and released the subjects.[6] Canto could not recall whether any of the occupants fit the description of those who had left the crime scene.

Canto was responsible for questioning Marco Ramirez, a passenger in the car. Canto believed he would have asked Ramirez whether he had been anywhere near the Jack in the Box; if he had answered affirmatively, Canto would have noted it. Canto did not note any kind of alibi, as, according to the witness in the in-field showup, these were not the people involved. Therefore, he and Alfano did what they needed to, in order to make sure they had enough information on the subjects so they could be contacted again. All of this information was forwarded to Canto's shift supervisor at the end of the night. Canto had nothing to do with a copy going to Sergeant Puder. Although these FI's bore a report number that matched the Jack in the Box report number, Canto did not know whether there was any cross-reference in the computer system. Canto did not write an actual report regarding the stop. In his training and experience, traffic stops are not always documented in formal reports. A supplemental report is prepared if there is a positive link to the crime, as when the in-field showup produces a possible or positive identification. In this case, however, the traffic stop and subjects contacted were documented on an FI card.

Prior to October 2007, Canto was not aware of requests to obtain copies or reports of the FI information or the photographs. When the prosecutor contacted Canto in October, Canto did not recall the vehicle stop, but looked into his activities history and, on October 30, located the stop and determined he had generated two FI cards. He promptly advised the prosecutor. If anyone had asked him previously whether he wrote a report on a stop, he would have researched it.

### Officer Alfano

Officer Alfano was handling unrelated calls for service when he was dispatched to transport a witness from the Jack in the Box to the Bank of the Sierra parking lot, where Canto had a vehicle stopped, for an in-field showup.[7] Alfano transported Tabitha Price to the location of the stop and allowed her to view the vehicle and its occupants. He did not have any conversation with her, but, after making sure she had had sufficient time,

---

[6] Canto described FI cards as documenting the date and time of a contact; reason for the contact; name, address, date of birth, and description of the persons contacted and any occupants of the vehicle; and a description of the vehicle.

[7] Either Canto or Alfano would have radioed descriptions of the vehicle and occupants to those on the scene at the Jack in the Box, so a decision could be made whether there was a close enough match to warrant an in-field showup.

returned her to the Jack in the Box. He subsequently learned from Officer Carsten that the identification was negative. He then returned to Canto's location to further assist with taking photographs and conducting field interviews of the vehicle's occupants.

Alfano interviewed Noe Orosco, who admitted gang membership. He and the other male were wearing gang attire. Alfano did not recall asking Orosco where he had been or whether he was at the Jack in the Box earlier, although he likely would have. Because nothing was written on the FI card to indicate Orosco said he was in the area at a certain time, Alfano assumed he said he was somewhere else. Alfano's memory likely would have been better in 2003 or 2004.

At the conclusion of the stop, no one was arrested. Alfano did not write any report. Because the subjects were not identified as being involved, Alfano and Canto covered their contact with the vehicle and its occupants by preparing FI cards. This was done, despite the negative identification, because it appeared the subjects were gang related. Alfano was not made aware of any requests to obtain copies of the FI information or photographs until near the time of the hearing.

*Officer Carsten*

Officer Carsten learned of Canto's vehicle stop via radio. Since he had a witness, Tabitha Price, present, he decided to have an in-field showup, although she had indicated she was not sure whether she could identify anyone and had been unable to give Carsten any information on the suspect vehicle. When Alfano brought her back from the vehicle stop location, she informed Carsten that she did not recognize either of the persons Canto had stopped. Her final statement to Carsten was that she was unsure. Carsten documented this in his report.

Canto informed Carsten that both subjects were interviewed through the FI process, although Carsten did not see a copy of the FI cards at the time. They should have gone to the lead investigator on the case.

*Detective Hickey*

At the time of the shooting, now-Detective Hickey was a new addition to VPD, and was undergoing field training with Officer Bernasconi. Hickey assisted in the investigation at the Jack in the Box by conducting some interviews. He then wrote reports documenting what he had done. To his knowledge, Bernasconi did not write any reports, as they had determined

Hickey would do so.[8] Hickey interviewed Rick and Adam Joy, each of whom described the suspect vehicle as possibly a 1963 Chevrolet Impala, metallic blue with primer spots or primer marks on the front passenger quarter panel. They said they were behind the victim's vehicle going into the drive-through, when they noticed a subject from the suspect vehicle walk up to the passenger side of the victim's vehicle, fire approximately five shots into the car, enter the driver's side of the suspect vehicle, and drive off. Hickey did not recall ever being given a description of the suspect vehicle as an 1980's Impala.

### Lieutenant Puder

In August 2003, Puder was a sergeant supervising the violent crimes unit, which conducted the investigation of the homicide at the Jack in the Box. Puder could not recall whether he was aware of the FI cards in 2003 or 2004. Given the notation on the cards that they were forwarded to him, it was possible he had seen them. Those types of FI's were commonly forwarded to him, and then routed to the investigating officer—in this case, Shear. Puder was not aware, in April and May of 2007, of requests for copies of the FI cards and photographs. When he subsequently saw the April 2007 request for the photographs, to which was attached a transcript of the dispatch traffic and which was returned to the district attorney's office with the notation that there were no photographs, he spoke with some of VPD's evidence people. Given that the request asked for photographs and bore a case number, apparently an assumption was made to provide all of the crime scene and evidence photographs. Instead, what needed to be done was to check a separate FI file, which is where the requested information was contained. Although VPD's master evidence log shows all the evidence booked in under a specific case, FI cards and related photographs are not routinely listed on the log, unless they have some evidentiary value. Case numbers are put on FI cards for a reference, as an investigative lead or tip to that case number. When Ginger Jarvis received the request that specifically mentioned a field identification, she should have searched for the items. She could have checked with the investigating officer, checked the computer for the officers involved, or checked the field identification file. In addition, VPD had a crime analysis unit that dealt strictly with field interviews, and she could have asked the unit's personnel.

At the conclusion of the evidence, the prosecutor represented, without objection or contradiction, that, after the FI cards and photographs came to light, they were shown to the Joys, who eliminated the car as the suspect vehicle. He further represented that Orosco and Ramirez had been contacted by the district attorney's office, denied involvement, and were eliminated,

---

[8] According to Hickey, he and Bernasconi talked about whether Bernasconi wrote a report, and he denied it.

through fingerprints, as having touched the bottles and car at the scene. The prosecutor conceded the evidence should have been disclosed, but argued it was not suppressed because it had been disclosed, albeit on the eve of trial. He further argued it was neither exculpatory nor material. He asserted that sanctions were not appropriate, and that a continuance was the proper remedy. Defense counsel responded that this was not a case of mere forgetfulness, but one in which the defense had affirmatively asked for the information. He argued that the Jack in the Box parking lot was full of vehicles on the night of the shooting, with pandemonium once shots were fired, and somehow Bernasconi obtained information from some witness that caused him to issue a BOL for a vehicle similar to the one stopped. Defense counsel asserted that the information concerning the vehicle stop was critical to the case, especially in light of the occupants' admitted gang membership and clothing. As for the Joys, he argued, they could not identify Meraz as the perpetrator, and Tabitha Price's comments were not exclusionary because she was unsure. Counsel noted that the officers no longer remembered what they asked the subjects of the stop or whether those persons had alibis. Because of the passage of time and because the defense asked for the information and was told it did not exist, counsel claimed he could not now interview Bernasconi or ask the vehicle's occupants where they were and what they did.[9] Counsel noted that the defense was in the process of investigating the information, which significantly changed the defense strategy and tactics, but that it was very difficult due to the fading memories of everyone involved.

The court stated the applicable test as being whether the evidence was exculpatory, whether it was intentionally suppressed, and whether there was prejudice. It accepted the fact that the prosecutor had conducted subsequent investigation and obtained statements from the car's occupants, indicating they were not involved, but observed that there would have been no need for a hearing had the information been provided in a timely manner, as requested by the defense. The court found it questionable whether the evidence was exculpatory, but noted that the testimony of the officers about what happened that night was sketchy, due to the time that had passed. The court further noted that, although the Joys may have described the suspect vehicle as a 1960's Impala, it was broadcast as a 1980's car, bright blue with small wheels, and that the vehicle in the photographs with the FI cards fit that description.

The court found the evidence was negligently, but not willfully, suppressed. It found prejudice to the defense, as witnesses' memories were

---

[9] On November 5, 2007, a defense investigator contacted Andrea Navarro, one of the occupants of the stopped vehicle. According to the investigator's report, Navarro stated she did not remember ever being in a vehicle that was stopped in Visalia, and denied knowing any of the people the investigator named as possibly being in the car with her.

sketchy, and the defense had wasted time, effort, and funds to find evidence that was readily available, had law enforcement turned it over as requested. The court observed that approximately four weeks had been spent selecting a jury, and, the day before the final 16 jurors were to be chosen, the prosecutor provided the defense with information the defense had repeatedly requested for three or four years.

The trial court found identity to be a significant issue in the case. It noted that a witness had identified a car and individuals as being involved in the shooting; a car of individuals was stopped approximately 30 minutes from the shooting scene; and the car and the individuals matched the description that was broadcast. A field identification was made and, while the witness was unable to identify the car's occupants as being involved, the police report also indicated the witness was unsure. Photographs of the individuals and the car were taken, officers obtained names and addresses, and all of that information was contained in the FI report. Although the case number attached to all of the police reports was also placed on the FI report, however, the information did not go into the master file. The trial court reiterated that the defense was entitled to the information, which it had requested for three to four years and been told did not exist. The court opined that, had the information been discovered after trial and a conviction, the conviction would have been set aside; or, had the information been discovered after a jury was sworn, the case might have been dismissed and jeopardy might have attached, allowing Meraz to walk free. The court further found that the cost, and time and effort, put into the case by the parties and court staff was in the thousands of dollars and hundreds of hours. It concluded:

"The sanction imposed by this Court must be such that reflects the magnitude of this discovery violation. . . . This situation rises to a level beyond mere accident.

"The failure of law enforcement to provide this information to the District Attorney until the late date amounts to negligence and appropriate measures must be taken to impress upon law enforcement that this conduct did not and will not be tolerated. Law enforcement has a fiduciary duty to respond to the District Attorney's requests to provide all the reports generated in the criminal case, especially one involving capital murder. Someone just didn't do what they should have done in making certain that the discovery requests was [sic] provided.

"It was certainly there when [the prosecutor] talked to the officer about his testimony the report was immediately referred to and provided. And [the prosecutor] correctly immediately provided it to the defense. A report that is so readily available should have been provided three years ago when it was first requested.

"This Court has wide discretion in imposing appropriate sanctions to remedy these types of discovery violation [*sic*] and to ensure that they won't happen again. [¶] . . . [¶]

"The Court feels that the appropriate remedy is to dismiss the special circumstance making this case a straight 187 with premeditation and deliberation with all the other enhancements and special allegations including the gang allegations, but it will not be a special circumstance case. That's the order of the Court."

The prosecutor asked whether the court was relying on any specific authority that allowed it to dismiss the special circumstance. The court responded that it had relied on the authorities presented (presumably, in the written motion and opposition), "and with the fact that a Court has great discretion in imposing sanctions that the Court feels are appropriate to the specific case. And case law repeatedly holds that negligence is on the same par as willful in terms of outcome and responsibility."

## DISCUSSION

### I

#### The People May Seek Writ Review.

The People challenge the trial court's dismissal of the special circumstance by way of a petition for writ of prohibition and/or mandate. As authority, they cite section 1512, subdivision (a), which states: "In addition to petitions for a writ of mandate, prohibition, or review which the people are authorized to file pursuant to any other statute or pursuant to any court decision, the people may also seek review of an order granting a defendant's motion for severance or discovery by a petition for a writ of mandate or prohibition." In our view, the order at issue here does not grant a motion for discovery (as would, for example, an order directing the People to disclose information concerning the traffic stop and FI cards in the first instance), but instead imposes a sanction for a discovery violation. As we conclude that writ review is appropriate in any event, however, we need not determine the scope of section 1512.

"As a general rule, the People may not seek an extraordinary writ in circumstances where the Legislature has not provided for an appeal. [Citations.]" (*People v. Superior Court (Vidal)* (2007) 40 Cal.4th 999, 1008 [56 Cal.Rptr.3d 851, 155 P.3d 259].) Although "[t]he prosecution's right to appeal in a criminal case is strictly limited by statute" (*People v. Chacon* (2007) 40 Cal.4th 558, 564 [53 Cal.Rptr.3d 876, 150 P.3d 755]), section 1238, subdivision (a)(8) permits the People to appeal from "[a]n order . . .

dismissing or otherwise terminating . . . any portion of the action including such an order . . . entered before the defendant has been placed in jeopardy . . . ." This provision applies here. (See *People v. Superior Court* (*Vidal*), *supra*, 40 Cal.4th at p. 1009; *People v. Hoban* (1985) 176 Cal.App.3d 255, 264–265 [221 Cal.Rptr. 626].)

A further requirement for issuance of either a writ of mandate or a writ of prohibition is the lack of "a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086; see *id.*, § 1103.) Meraz says the People have failed to demonstrate immediate review is necessary, since application of the special circumstance will become relevant only in the event he is convicted of murder. That Meraz might ultimately not be convicted of murder, however, does not demonstrate the existence of a plain, speedy, and adequate remedy in the ordinary course of law. Were that the case, then, by parity of reasoning, a defendant would be hard pressed to seek pretrial review of a trial court's *refusal* to dismiss a special circumstance, since he or she might ultimately not be convicted of the underlying murder.

Meraz further says the People have failed to demonstrate that an appeal following a guilty verdict and imposition of sentence without the special circumstance would be inadequate. Assuming such an appeal would not run afoul of constitutional prohibitions against double jeopardy—something we seriously doubt—it manifestly would be neither speedy nor adequate, especially in light of the differences, both procedural and substantive, between capital and noncapital trials.

Finally, Meraz points out that a writ of mandate cannot be used to control the exercise of discretion. While true, "that rule is qualified in that, 'An abuse of discretion . . . is not the exercise of discretion, but is action beyond the limits of discretion, and it is settled that the writ will issue to correct such abuse if the facts otherwise justify its issuance.' [Citation.]" (*Hays v. Superior Court* (1940) 16 Cal.2d 260, 266 [105 P.2d 975].) "[E]xtraordinary relief is appropriate if the trial court's ruling is clearly erroneous as a matter of law and the petitioner will suffer substantial prejudice. [Citation.]" (*Prince v. Superior Court* (1992) 8 Cal.App.4th 1176, 1179 [10 Cal.Rptr.2d 855].) As we proceed to explain, such is the situation here.

## II

### THE SPECIAL CIRCUMSTANCE ALLEGATION MAY NOT BE DISMISSED AS A SANCTION FOR THE DISCOVERY VIOLATION.

■ Section 1054 et seq. "governs the scope and process of criminal discovery" in this state. (*People v. Tillis* (1998) 18 Cal.4th 284, 289 [75

Cal.Rptr.2d 447, 956 P.2d 409].) Pursuant to section 1054, the chapter comprising the discovery statutes "shall be interpreted to give effect to[, inter alia,] the following purposes: [¶] (a) To promote the ascertainment of truth in trials by requiring timely pretrial discovery. [¶] . . . [¶] (e) To provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States."

In terms of the disclosure that is statutorily required, section 1054.1 mandates that the prosecutor "shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence. [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

With respect to the disclosure mandated by the Constitution, " '[t]he prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant' when the evidence is 'both favorable to the defendant and material on either guilt or punishment.' [Citations.] Evidence is 'favorable' if it hurts the prosecution or helps the defense. [Citation.] 'Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 866 [85 Cal.Rptr.2d 857, 978 P.2d 15]; see, e.g., *United States v. Bagley* (1985) 473 U.S. 667, 674–678 [87 L.Ed.2d 481, 105 S.Ct. 3375] (*Bagley*); *Brady, supra*, 373 U.S. at p. 87; *In re Sassounian* (1995) 9 Cal.4th 535, 543–545 [37 Cal.Rptr.2d 446, 887 P.2d 527].) "A prosecutor's duty under *Brady* to disclose material exculpatory evidence applies to evidence the prosecutor, or the prosecution team, knowingly possesses or has the right to possess. The prosecution team includes both investigative and prosecutorial agencies and personnel. [Citations.] The prosecution must disclose evidence that is actually or constructively in its possession or accessible to it. [Citation.] The important determination is whether the person or agency has been 'acting on the government's behalf' [citation] or 'assisting the government's case' [citation]." (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358 [133 Cal.Rptr.2d

434]; accord, *Youngblood v. West Virginia* (2006) 547 U.S. 867, 869–870 [165 L.Ed.2d 269, 126 S.Ct. 2188]; *Kyles v. Whitley* (1995) 514 U.S. 419, 437 [131 L.Ed.2d 490, 115 S.Ct. 1555].) "Moreover, the duty to disclose exists regardless of whether there has been a request by the accused, and the suppression of evidence that is materially favorable to the accused violates due process regardless of whether it was intentional, negligent, or inadvertent. [Citations.]" (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225 [53 Cal.Rptr.3d 572].)

The People have always conceded that the FI cards and photographs at issue here should have been turned over to the defense earlier than they were, and that the failure to do so was negligent.[10] We accept this concession, and conclude the record supports the trial court's finding of a discovery violation.

■ We turn now to the question of sanctions. Section 1054 et seq. is "the only means by which the defendant may compel the disclosure or production of information . . . ." (§ 1054.5, subd. (a).) If it is shown that one party has not made the required disclosure, while the other party has complied with the informal discovery procedure set out in subdivision (b) of section 1054.5 (a showing that was made here), "a court may make any order necessary to enforce the provisions of [section 1054 et seq.], including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).)

Generally speaking, we review a trial court's ruling on discovery matters under an abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299 [96 Cal.Rptr.2d 682, 1 P.3d 3].) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].) "In particular, 'a trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to the prosecution's violation of a discovery order.' [Citation.]" (*People v. Ayala, supra,* 23 Cal.4th at p. 299.)

■ The court's power to craft appropriate sanctions is not unlimited, however. Section 1054.5, subdivision (c) provides: "The court may prohibit

---

[10] Section 1054.7 requires disclosures to be made at least 30 days prior to trial; if the information becomes known to or into the possession of a party within that 30 days, disclosure must be made immediately. The prosecutor personally complied with these timeliness requirements; the problem, of course, is that the police did not, and their negligence is attributed to the prosecutor.

the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted. *The court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States."* (Italics added.) Although "[t]he constitutional duty that requires prosecutors to disclose exculpatory evidence to a criminal defendant under *Brady* is independent from the statutory duty to provide discovery under section 1054.1," such that "evidence that is material under *Brady* must be disclosed to the defense, notwithstanding any failure of the defense to enforce its statutory right to discovery" (*People v. Jordan, supra,* 108 Cal.App.4th at p. 359), whether a sanction of dismissal can be imposed in this state depends on whether dismissal is required by the United States Constitution. "Thus, the question here is not whether the trial court abused its discretion in dismissing the case, but whether the trial court erred as a matter of law in dismissing the case because the federal Constitution did not require dismissal." (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1212 [60 Cal.Rptr.3d 624].)

As a preliminary matter, we are not cited to, and our own research has failed to uncover, any cases addressing whether section 1054.5, subdivision (c)'s limitation on the dismissal of "a charge" encompasses the dismissal solely of an allegation that goes beyond the underlying substantive offense, such as the special circumstance in the instant case. We think that it must, as counsel for Meraz conceded at oral argument.

■ Section 1054 et seq. was added by the initiative measure known as Proposition 115, which was approved by voters on June 5, 1990. " 'In interpreting a voter initiative we . . . apply the same principles that govern statutory construction. [Citation.] Thus, "we turn first to the language of the statute, giving the words their ordinary meaning." [Citation.] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.] In other words, 'our primary purpose is to ascertain and effectuate the intent of the voters who passed the initiative measure.' [Citation.]" (*People v. Briceno* (2004) 34 Cal.4th 451, 459 [20 Cal.Rptr.3d 418, 99 P.3d 1007]; see also *People v. Pieters* (1991) 52 Cal.3d 894, 898–899 [276 Cal.Rptr. 918, 802 P.2d 420].) We avoid any interpretation that would lead to absurd consequences. (*People v. Elliot* (2005) 37 Cal.4th 453, 478 [35 Cal.Rptr.3d 759, 122 P.3d 968].)

In our view, "a charge" is susceptible of more than one interpretation. It could mean the substantive offense itself. It could mean everything included in a particular count of the accusatory pleading. Or, it could mean a charging allegation, such as, for example, a sentence enhancement or special circumstance. (See *People v. Briceno, supra,* 34 Cal.4th at pp. 459–460 ["felony

violation," as used in § 1192.7, subd. (c)(28), could refer only to substantive felony offenses, or could also be read to include sentence enhancements].) Because the term is not clear on its face, we determine its meaning in light of Proposition 115 as a whole. (See *People v. Briceno, supra,* at p. 460.)

" 'Proposition 115 was a remedial measure enacted . . . to make "comprehensive reforms . . . in order to restore balance and fairness to our criminal justice system." [Citation.] The voters expressly found "that it is necessary to reform the law as developed in numerous California Supreme Court decisions and as set forth in the statutes of this state. These decisions and statutes have unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth." [Citation.]' [Citation.] Also incorporated within the text of the proposed law were the People's findings that 'the rights of crime victims are too often ignored by our courts and by our State Legislature, [and] that the death penalty is a deterrent to murder.' [Citation.]" (*People v. Elliot, supra,* 37 Cal.4th at p. 478.)

In light of the foregoing, we find it highly doubtful the electorate intended to permit dismissal of a charging allegation—particularly a special circumstance—if not required by the federal Constitution. Accordingly, we turn to whether, on the facts of this case, the United States Constitution required dismissal of the special circumstance allegation.

As a criminal defendant has no general constitutional right to discovery (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559 [51 L.Ed.2d 30, 97 S.Ct. 837]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1258 [275 Cal.Rptr. 729, 800 P.2d 1159]), "*Brady* exculpatory evidence is the only substantive discovery mandated by the United States Constitution." (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1314 [96 Cal.Rptr.2d 264]; see *Gray v. Netherland* (1996) 518 U.S. 152, 168 [135 L.Ed.2d 457, 116 S.Ct. 2074].) Thus, in order to decide whether the trial court here erred as a matter of law in dismissing the special circumstance because the federal Constitution did not require dismissal, "we must determine whether a *Brady* violation occurred. If there was no *Brady* violation, then there was no conceivable basis for concluding the federal Constitution required dismissal." (*People v. Ashraf, supra,* 151 Cal.App.4th at p. 1212.)[11]

---

[11] At oral argument, counsel for Meraz presented more of a general due process/fundamental fairness argument than the specific *Brady* claim asserted in the trial court. The whole foundation for *Brady,* however, is due process and its requirement that an accused be afforded a fair trial. (See *Bagley, supra,* 473 U.S. at p. 675; Brady, *supra,* 373 U.S. at p. 87.) We see no basis, on the record before us, for concluding Meraz will be denied a fair trial, absent a *Brady* violation.

■ Although most reviewing courts called upon to determine the existence of a *Brady* violation do so following a trial and conviction, the same standard applies when the issue arises pretrial: "[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].) Thus, although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material' "— "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 [144 L.Ed.2d 286, 119 S.Ct. 1936], fn. omitted; accord, *People v. Salazar* (2005) 35 Cal.4th 1031, 1042–1043 [29 Cal.Rptr.3d 16, 112 P.3d 14].)

We question whether there truly was suppression in the instant case. Our Supreme Court has observed that "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715 [21 Cal.Rptr.3d 682, 101 P.3d 568].) It would seem necessarily to follow that information disclosed in advance of trial is not considered suppressed, even assuming it should have been given to the defense earlier. On the other hand, we recognize that "[d]isclosure, to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused. [Citation.]" (*United States v. Davenport* (9th Cir. 1985) 753 F.2d 1460, 1462.)

As previously described, "[e]vidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 544.) Stated another way, "[f]avorable evidence is evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused." (*People v. Osband* (1996) 13 Cal.4th 622, 665 [55 Cal.Rptr.2d 26, 919 P.2d 640]; see *Bagley, supra,* 473 U.S. at p. 676.) The trial court here found it questionable whether the late-disclosed information was exculpatory. We agree, especially if, as the prosecutor represented and the trial court apparently accepted as true, the Joys have excluded the vehicle as being that of the shooter. Whether, under all the circumstances, the defense could make something favorable out of the fact the vehicle that was stopped apparently was consistent with the BOL broadcast and one of its occupants arguably fit the description of the

shooter, is unclear, because we have, at this juncture, no way of knowing what further investigation of the vehicle's occupants might reveal. Similarly, we have no way of knowing what the Joys might recall concerning their interaction with Officer Bernasconi. Although we recognize the passage of time is likely to have affected memories, this does not mean further investigation will be futile or of no avail to the defense. Tellingly, at oral argument, counsel for Meraz could only say the information was *potentially* exculpatory.

■ Moreover, a *Brady* violation requires not only the suppression of evidence that is favorable to an accused, but also that the evidence is material to guilt or punishment. (*Bagley, supra,* 473 U.S. at p. 674; *People v. Osband, supra,* 13 Cal.4th at p. 665; see *Brady, supra,* 373 U.S. at p. 87; *People v. Hoyos* (2007) 41 Cal.4th 872, 917 [63 Cal.Rptr.3d 1, 162 P.3d 528].) " 'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 829 [9 Cal.Rptr.2d 24, 831 P.2d 249], quoting *United States v. Agurs, supra,* 427 U.S. at pp. 109–110.) As we have described it in terms of posttrial analysis of nondisclosure, " '[m]ateriality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction "more likely" [citation], or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation]. A defendant instead "must show a 'reasonable probability of a different result.' " [Citation.]' [Citation.] Thus, '[e]vidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." [Citations.] The requisite "reasonable probability" is a probability sufficient to "undermine[ ] confidence in the outcome" on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.] Further, it is a probability that is, as it were, "objective," based on an "assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision," and not dependent on the "idiosyncrasies of the particular decisionmaker," including the "possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." [Citation.]' [Citations.]" (*In re Soldersten, supra,* 146 Cal.App.4th at pp. 1226–1227.)

■ In assessing materiality, we must keep in mind that " 'an incomplete response to a specific [*Brady*] request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.' [Citation.] Given this

possibility, 'under the ["reasonable probability"] formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.' " (*In re Brown* (1998) 17 Cal.4th 873, 887 [72 Cal.Rptr.2d 698, 952 P.2d 715]; see *Bagley, supra,* 473 U.S. at pp. 682–683.)

Finally, a showing of the favorableness and materiality of undisclosed evidence "necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 545, fn. 7; see *In re Sodersten, supra,* 146 Cal.App.4th at p. 1228; *Kyles v. Whitley, supra,* 514 U.S. at p. 435.)

■ The record before us does not support a finding of materiality. We accept defense counsel's representation that his tactics and strategy would have been different had the information been disclosed in a timely manner, but the record as it presently exists does not support a conclusion, in light of the fact trial has been continued, that the defense will be unable effectively to pursue the desired strategies and tactics. This being the case, the record does not support a conclusion that a *Brady* violation has been shown.[12] (See *People v. Osband, supra,* 13 Cal.4th at p. 665.) There being no *Brady* violation, the trial court erred by impliedly concluding the federal Constitution required dismissal of the special circumstance allegation.[13] (See *People v. Ashraf, supra,* 151 Cal.App.4th at p. 1212.)

---

[12] Although an assessment of the extent to which the late disclosure has affected the ability to present a defense necessarily involves a degree of conjecture (*People v. Caldwell* (1991) 230 Cal.App.3d Supp. 1, 4 [282 Cal.Rptr. 272]), the standard of materiality is a reasonable *probability.* Speculation does not constitute a probability. Our conclusion in this regard is, of course, based only on the record as it existed when the trial court ruled, and we express no opinion with respect to situations that might develop, or showings that might be made, as a result of subsequent investigation or events. (See *Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 121 [22 Cal.Rptr.3d 647].)

[13] The trial court's ruling suggests it was at least equally as concerned with punishing VPD and making sure such a problem did not arise in the future, as it was with protecting Meraz's right to a fair trial. Even leaving aside the limitation contained in section 1054.5, subdivision (c), however, the sanction of dismissal, imposed as punishment, "is not appropriate, and lesser sanctions must be utilized by the trial court, unless the effect of the prosecution's conduct is such that it deprives the defendant of the right to a fair trial. [Citation.]" (*Derek L. v. Superior Court* (1982) 137 Cal.App.3d 228, 235 [186 Cal.Rptr. 870]; accord, *Mendibles v. Superior Court* (1984) 162 Cal.App.3d 1191, 1198 [208 Cal.Rptr. 841]; see *U.S. v. Kearns* (9th Cir. 1993) 5 F.3d 1251, 1254 [assuming failure to disclose in timely manner qualifies as *Brady* violation, dismissal of indictment is appropriate sanction for constitutional violation only where less drastic alternatives are not available].) We reiterate that it would be speculative, on the record that is before us and that was before the trial court, to conclude the late disclosure deprived Meraz of his right to a fair trial.

Meraz argues that, regardless of the foregoing, the trial court's reasonable concern about the specter of an unfair capital trial justified the exercise of its discretion to dismiss the special circumstance allegation. (See *Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 96 S.Ct. 2978] [because penalty of death is qualitatively different from sentence of imprisonment, however long, there is heightened need for reliability in determination that death is appropriate punishment in specific case].) He says the court's ruling should be upheld as being supportable under its power derived from section 1385.

■ Even if we read the trial court's ruling as expressing the concern Meraz says it does, we could not uphold it. Subdivision (a) of section 1385 provides, in pertinent part: "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal must be set forth in an order entered upon the minutes." Here, the motion made and granted was that of Meraz, not the trial court or the prosecutor. "The statute makes no provisions for a defendant to move for dismissal. [Citations.]" (*People v. Andrade* (1978) 86 Cal.App.3d 963, 973 [150 Cal.Rptr. 662].) Moreover, nothing in the trial court's ruling suggests it was, in fact, exercising its authority under, and specifically basing its order upon the authority contained in, section 1385. (*Andrade, supra,* at p. 974.) Additionally, there is nothing before us to show that, as required by the statute, the reasons for dismissal have been set forth in the minutes. (*Ibid.*) "Requirement of a statement of reasons for dismissal pursuant to section 1385 is mandatory, not directory [citation], and in the absence of such statement 'the order may not be considered a dismissal under section 1385.' [Citation.]" (*People v. Hunt* (1977) 19 Cal.3d 888, 897 [140 Cal.Rptr. 651, 568 P.2d 376], fn. omitted.) "If valid reasons are expressed in the reporter's transcript but do not appear in the minutes, the mandatory requirements have not been met. [Citation.]" (*People v. Superior Court (Flores)* (1989) 214 Cal.App.3d 127, 135–136 [262 Cal.Rptr. 576].) Finally, even if the procedural hurdles to Meraz's argument could be overcome, because dismissal occurred in the context of a discovery violation, we believe the situation would still be covered by section 1054.5, subdivision (c), and that section 1385 could not be used to circumvent the limitation on dismissal contained therein. (See *People v. Betts* (2005) 34 Cal.4th 1039, 1058 [23 Cal.Rptr.3d 138, 103 P.3d 883] [addressing specific versus general statutes].)

## DISPOSITION

Let a writ of mandate issue directing the Superior Court of Tulare County to vacate its order of November 19, 2007, dismissing the special circumstance allegation, and to enter a new order denying the motion to dismiss.

The order filed in this court on December 14, 2007, staying trial court proceedings in this matter, shall remain in effect until this opinion is final in all courts of this state, the California Supreme Court grants a hearing herein, or respondent court complies with the directions in this opinion as stated above, whichever shall first occur.

Cornell, J., and Kane, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied August 13, 2008, S164726. Baxter, J., did not participate therein.