Filed 3/1/16  P. v. Mora CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ERIC STEWART MORA,<br><br>        Defendant and Appellant. | A136324<br><br>(Alameda County<br>  Super. Ct. No. C163698) |

        This is an appeal from final judgment following the conviction by jury of defendant Eric Stewart Mora for second degree murder.  Defendant identifies a multitude of purported errors during his trial in seeking reversal of this judgment, including thirteen separate incidents of prosecutorial misconduct, erroneous admission of hearsay and other evidence, erroneous exclusion of third-party culpability evidence and impeachment evidence, several instances of ineffective assistance from counsel, and violation of his right to a public trial.  For reasons set forth below, we agree several errors occurred during trial, at least one of which was to defendant's prejudice.  We therefore reverse the judgment and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

        On May 20, 2010, defendant was charged by information with committing second degree murder in violation of Penal Code section 187, subdivision (a).  Defendant's alleged victim was Cynthia Alonzo (also known as Linda Alonzo), his girlfriend of about two years.  Alonzo disappeared on Thanksgiving Day 2004, and was never seen or heard

1

from again. Although presumed dead long before defendant's arrest in 2007, Alonzo's body has never been found.

Trial by jury commenced on January 3, 2012. The trial, which lasted several weeks, produced the following evidence.

In 2004, both Alonzo and defendant were living in Oakland. Alonzo lived in an apartment on Martin Luther King Boulevard with her daughter, Tishone Banks, granddaughter Shaquila and son, Anthony Alonzo. Defendant, in turn, owned and lived in a house on Brookside Avenue with his brother, Mark Mora (Mark). Mark's girlfriend, Sybil Straughter, also lived in the house, and Alonzo sometimes stayed there. Mark did not get along with Alonzo, and preferred that she not come to their house, even encouraging defendant to get a restraining order against her.

Defendant had a more or less tumultuous relationship with Alonzo. Even during relatively peaceful periods in their relationship, defendant and Alonzo were "constant[ly] arguing." One of Alonzo's longtime neighbors, Roderick Stanley, testified that he had once seen defendant force Alonzo into his car after telling her, "Bitch, get in the car." The couple appeared to be fighting. Prior to this incident, Alonzo had told Stanley she was "tired" of defendant.

On Thanksgiving Day, November 25, 2004, Alonzo failed to appear for a family gathering at her mother's house in San Francisco. Alonzo had close familial ties and, prior to her disappearance, remained in regular contact with her mother, Corrine Wallace, and her five children, Tishone Banks, Terresa Jones, Anthony Alonzo, Tyrone Jones, and Lashawn Jones. [1] Alonzo nearly always attended family gatherings during the holidays at her mother's house, and Thanksgiving was her favorite holiday. For this particular holiday gathering, Alonzo had told her mother and children she would be there.

Around the time of the Thanksgiving holiday, Alonzo and defendant were experiencing a "rocky" period in their relationship. Alonzo was also having problems with Linda Haymon, the mother of defendant's three children. Haymon and defendant

---

[1]     Alonzo had several children, three with the "Jones" surname. For clarity, we refer to her children by their first names only, intending no disrespect.

had been together nearly 30 years when she discovered defendant's relationship with Alonzo by listening to his voicemails. Until Haymon made this discovery, defendant mostly resided at her East Oakland house. However, after Haymon confronted defendant and told him to choose between her and Alonzo, defendant chose Alonzo and began to mostly reside at his house on Brookside Avenue.

Nonetheless, at some point, Haymon and defendant reunited, causing Alonzo to break off her relationship with defendant. Their break-up did not last, however. According to Terresa, Alonzo's daughter, defendant owed Alonzo money for work she had done for him, and she did not think Alonzo would leave defendant until he paid up. Alonzo had also told Terresa that Mark and Straughter wanted Alonzo and defendant to break up because they were concerned that defendant had promised to buy her a house with money he expected to inherit. Terresa was once involved in a physical altercation with Alonzo, Mark and Straughter, during which Mark hit Alonzo in the face and Straughter threw water on Alonzo, prompting Terresa to hit Mark with a frying pan.

On November 20, 2004, Terresa could not get in touch with her mother. She eventually went to defendant's Brookside house to ask whether he had seen Alonzo. Defendant, appearing angry and frustrated, told Terresa that they had a big argument, and that Alonzo had left in his car. The next day, November 21, Terresa called defendant to inquire as to Alonzo's whereabouts. Defendant told Terresa that Alonzo had gone to the store. He then added: "I just want you to explain to me what your mother [sic] personality is because I can't seem to understand what kind of person she is." Terresa told him that, after two years of dating Alonzo, he should know her personality, and that, if they could not stop fighting, they should not be together. Defendant responded that he loved Alonzo and wanted their relationship to work. He also told Terresa that he intended to accompany Alonzo to her mother's house on Thanksgiving.

Later that day, Terresa was able to get in touch with Alonzo, who was upset that Terresa had told defendant they should break up. Terresa told Alonzo that she wanted to protect her, to which Alonzo responded that she need not worry, that their future would be brighter, and that she intended to "start taking care of her business in the right way."

3

Alonzo then confirmed that she would see both Terresa and Lashawn at Wallace's house on Thanksgiving. However, Alonzo never appeared at her mother's home, and neither did defendant. Her family, surprised that Alonzo would miss the holiday gathering, tried unsuccessfully to reach her.

Two of Alonzo's downstairs neighbors, Dorothy Easley and Katrina Hall, did see Alonzo on Thanksgiving Day 2004. According to the women's testimony, Alonzo stopped by their apartment around 2:00 p.m., stating that she was going to get ready for a family gathering at her mother's house, and that her boyfriend, defendant, whom Hall had met, would be taking her there. Alonzo later stopped by again to say goodbye. She was carrying a small backpack with her. Easley and Hall then saw Alonzo get into defendant's blue Mercedes with him.[2]

Mark testified that he spent Thanksgiving Day 2004 at his grandmother's house with Straughter and his daughter. He did not see defendant until returning home later that evening. Defendant was in his downstairs bedroom, and Mark knocked on the door to tell him they had brought him dinner. Defendant told Mark to leave it outside the door, which Mark did. Later, when Mark asked about Alonzo, defendant told him he had dropped her off at a liquor store two or three days before Thanksgiving.

The day after Thanksgiving, Terresa stopped by Alonzo's house, but she was not there. When Terresa went into Alonzo's room, she found a big mess with clothes everywhere. Terresa could not find the small backpack her mother generally carried with her with makeup and her Electronic Benefits Transfer (EBT) card, which holds food stamps and a cash benefit. Terresa did find, however, her mother's wallet with her identification, social security card and debit card in its usual place under the mattress.

---

[2]     Hall and Easley testified at the preliminary hearing that they last saw Alonzo on November 24, 2004, the day before Thanksgiving. In addition, Hall testified at the preliminary hearing that she did not see Alonzo get into defendant's car. Hall explained these discrepancies by the fact that she was afraid to tell the truth at the preliminary hearing because she had been threatened by several people, including two men who came to her house and told her: "You best not say anything because if you do, you're going to end up like her."

Later that day, Terresa went with her sister, Tishone, to defendant's home on Brookside Avenue. Defendant told the women he had not seen their mother for two weeks. Terresa described defendant's demeanor as "very nervous," "shaking," and "weird." "He was real fidgety. He was constantly moving his hands, and you could see his hands were shaking." When Terresa reminded defendant about their phone conversation about a week ago during which he told her he had just seen Alonzo, defendant replied: "I told you I haven't seen your mom in two weeks." Defendant then told Terresa he had last seen Alonzo a week ago when he dropped her off at a liquor store. Defendant eventually let Terresa enter his house, where she went to his bedroom and noticed that a large rug was missing and that a table had been moved. Terresa also noticed furniture missing from the living room. Defendant did not appear concerned with Alonzo's whereabouts, and did not offer to help look for her. Terresa told defendant she believed he was lying and intended to call the police, which defendant discouraged.[3]

Later, Terresa had her brother, Tyrone, meet them at defendant's house, and a confrontation occurred with Mark and defendant. According to Mark, Tyrone had a gun and threatened defendant. At some point during the confrontation, Mark told Terresa and her brother to "[a]sk [defendant], he knows where your mom is at. It's not me, it's [defendant]. He knows where your mom is at." Defendant then replied: "Mark, don't tell them that."

After that day, Terresa returned to defendant's house about 15 times looking for her mother. One time, in early December 2004, defendant told her: "Holly Rock came and picked [Alonzo] up from his house." Finally, on December 6, 2004, Terresa called the police to report her mother missing. Officer Jacqueline Shaw of the Oakland Police Department (the department) responded and, at Terresa's request, went to defendant's house to inquire about Alonzo. Defendant, appearing "very nervous" and "agitated," told Officer Shaw: "She's not here." After inviting Office Shaw and her partner to enter,

---

[3]     Alonzo's mother also described defendant as unconcerned about Alonzo's well-being or trying to find her. Defendant told Wallace about two or three weeks after Thanksgiving 2004 that he did not know Alonzo's whereabouts.

defendant "started rambling about things that I wasn't asking. Like he was providing information anticipating a question that I was going to ask. You know, his hands were very fidgety . . . as I looked at his hands, I noticed scratches on the back of his hands. It was more of the fact that he was fidgety and just seemed agitated that I took to be nervous."[4]

Defendant told Officer Shaw he had not seen Alonzo since two days before Thanksgiving, when he had dropped her off at 24th and Martin Luther King Boulevard in Oakland. He acknowledged that, at the time, they had been arguing, and that they were out of contact because their relationship had not been going well. After Officer Shaw's partner determined defendant was on probation with a search condition, they handcuffed him and placed him in their vehicle. During their subsequent search of the premises, Officer Shaw noticed a discolored patch of the living room floor that did not appear to have been sanded. Other parts of the property appeared to be under construction. In one of defendant's vehicles, they found a "large sharp looking" knife-like object. When the officers released defendant from their vehicle, he was "very, very sweaty" and "seem[ed] very, very nervous." Officer Shaw then noticed a "really nasty cut" in the web of his hand. When she commented on it, defendant stated that he "had cuts all over. Look at all the work we're doing [on the house]. Of course I have cuts." He then "rambl[ed] out real quickly" that "[he] cut it on some glass that [he] threw away in the trash can." When Officer Shaw asked whether she could see the glass, defendant replied it was "long gone."

Officer Daniel Castanho, a missing-persons investigator for the department, filed the original missing-persons report for Alonzo and entered her information into a national database. Officer Castanho also created a flyer with Alonzo's photograph and information, which was broadly distributed to the media, law enforcement, and

---

[4]   According to Officer Shaw, the scratches on defendant's hands "were kind of jaggedy, fairly superficial in terms of depth into the skin but kind of wide in nature. It was almost like they were cat scratches or wider. I would think they would look like fingernail scratches. That was my impression."

elsewhere. On December 8, 2004, his partner, Officer Steve Bukala, was assigned to the case. The two officers went to defendant's house. Defendant, appearing "very nervous" and "sweating, talking really fast," came outside to meet them. The officers described his behavior as "odd," looking around, shaking, and his voice breaking. At the same time, defendant did not appear to be concerned about Alonzo, whom he said he had last seen "two, three, four, five days, let's call it four days before Thanksgiving," when he dropped her off at Captain's Liquors on 24th and Martin Luther King Boulevard at 10:00 a.m. Defendant described his relationship with Alonzo as based on "drugs and sex and that was about it."

On December 9, 2004, defendant rented a kit for sanding floors. The next day, he returned the kit without having used the finer-grit sand paper. John Villarosa, who rented the kit to defendant, testified that, when a floor is sanded with only rough-grit sand paper, sanding lines remain on the floor and the wood grains will more quickly absorb dirt. Photographs taken of defendant's floor indicated the floor had retained some of its finish and needed more sanding. In addition, criminalist Todd Weller testified that, if you sand a floor enough, evidence of blood will be removed. Haymon testified, however, that the floors in defendant's house were sanded to prepare the house for sale.

Also on December 9, 2004, a news story regarding Alonzo's disappearance aired, providing a phone number for persons with relevant information. An anonymous person thereafter called Terresa and told her that, if she wanted to find her mother, she should look at the Lake Temescal children's playground, which was about a block from defendant's house. Terresa visited the park the next day with several family members and friends, as well as Alonzo's dog. The dog found a backpack in the mud that appeared similar to one belonging to Alonzo.[5] Terresa later called the police, who responded with a search team that included Officer Bukala. By the time the police arrived, however, the family had moved the backpack to a picnic table. The police used dogs to search an area of "disturbed ground" near the parking lot, but could not find

---

[5] Officer Bukala testified that Terresa told him her brother, Tyrone, found the backpack, not her dog.

7

anything of significance. Officer Bukala looked at the backpack, but found "no distinguishing marks at all on it." No forensic testing was ultimately done on the backpack.

On December 10, 2004, Officer Bukala returned to defendant's house at about 8:00 a.m. He could hear a machine that sounded like a floor sander and could see defendant sanding the living room floor. When defendant answered the door, he appeared to be covered in sawdust. Officer Bukala described the sanding work as "pretty sporadic." Defendant told Officer Bukala during the visit that he wanted to clear up a lie he had told the previous day. Defendant then explained he did not drop Alonzo off at 24th and Martin Luther King, but, rather, "over off of Athens," where she was going to buy drugs. He misspoke earlier because he did not want to be a "snitch." However, he continued to appear unconcerned about Alonzo, and did not indicate he had tried to call or locate her.

Officer Bukala subsequently pursued other leads. For example, Officer Bukala followed up on information he received that Alonzo had filed two police reports a few weeks before Thanksgiving. He also learned Alonzo had applied for relocation funds from a local organization called Victims of Violent Crime. Further, Officer Bukala obtained the transaction history of Alonzo's EBT cards. A later investigation into the transaction histories for both defendant's and Alonzo's EBT cards revealed that, between April and October 2004, both of their cards were used several times within moments of each other at Captain's Liquors. In addition, someone made balance inquiries, which requires knowledge of the EBT card number and PIN number, on Alonzo's EBT card four times in December 2004, after her disappearance.[6] Officer Bukala tried to locate surveillance video from Captain's Liquors that would reveal who made these inquiries, but surveillance of the store's EBT machine was not available. Finally, Officer Bukala also contacted several of Alonzo's neighbors and checked local hospitals, but could not generate any leads.

---

[6]     Alonzo's EBT card was last used to purchase food on November 23, 2004, at 4:23 p.m., at Captain's Liquors.

At some point toward the end of December 2004, Officer Bukala lost track of defendant. Defendant did not appear for an appointment with him scheduled for December 14, 2004. He surveyed defendant's house during the last week in December 2004, but never saw him. Neither Mark nor Straughter knew his whereabouts.

Ultimately, in late December 2004, Officer Bukala began transitioning the case to Sergeant Derwin Longmire, a homicide detective. Together, they obtained a search warrant, signed on December 26, 2004, to search defendant's house and seven vehicles linked to him by DMV records. This search occurred while both Mark and Straughter were home, and revealed the following evidence. From one of defendant's cars, the officers found a large knife with 10-inch blade and leather sheath, as well as a canvas bag with paper bands of the sort used to sort money with the numbers "8,000" and "2,000" written on them. In defendant's blue Mercedes, they noticed missing floor mats and carpeting from both sides of the front seat, missing carpeting or upholstery from the area behind the seats, and missing carpeting from the trunk. Inside the house, they noticed the main floors had been sanded in a "haphazard" and "very uneven" fashion. The floors in defendant's bedroom also appeared to have been sanded.

Criminalist Weller, who accompanied the officers, found a slip and two shirts in the laundry room with blood stains, blood stains on a wall in defendant's downstairs bedroom, and blood stains on the door between defendant's room and the laundry room. The blood stains on the bedroom wall were both about 14 inches from the floor and one was three inches long, while the other was one inch long. This bedroom wall was moldy in places, and there were marks indicating the area had been wiped in a non-uniform way. There was also a blue sheet hanging over one window, and there were bloodstains behind the sheet hidden by mold. When sprayed with a chemical, Luminal, the wall gave a "strong positive reaction," likely indicating the presence of blood.[7]

---

[7] Weller later testified that he found nothing about the pattern of sanding on the floors in the main floor that indicated the sanding was intended to remove material from any particular location.

After their search, Sergeants Longmire and Nolan interviewed Straughter and Mark. Straughter told them she and Alonzo did not get along. According to Straughter, defendant and Mark had taken out a $75,000 loan on their house in the Fall of 2004, and Alonzo had told her she was going to get a share of defendant's money. Whenever Straughter inquired as to Alonzo's whereabouts after Thanksgiving 2004, no one would answer her. Neither Straughter nor Mark could provide an explanation for the blood found by Weller in defendant's bedroom, although Straughter did tell Longmire that blood in the house could be explained by a home invasion in 2003, during which two men pistol-whipped her, Mark, and their house guest. Mark, in turn, said he was surprised and upset to learn the floors in their house had been sanded, insisting he played no part in that decision.

The police later ran DNA tests on the blood-stained clothing items found in defendant's house. Blood on one shirt matched Alonzo's profile,[8] and blood on the other shirt matched defendant's profile.

Sergeant Longmire thereafter spent "weeks upon weeks upon weeks" looking for defendant to no avail.[9] Nonetheless, Sergeant Longmire continued to periodically survey defendant's house from 2005 to 2007 and, in early 2007, he noticed a realtor sign at the house. Sergeant Longmire then learned through the realtor that defendant was in the area and obtained an arrest warrant for him.

On February 22, 2007, defendant was arrested and then interviewed after waiving his *Miranda* rights.[10] During this interview, defendant initially denied having a wife, girlfriend or children. He repeatedly referred to Alonzo as "that girl," and indicated he

---

[8]     The shirt with Alonzo's blood showed defendant as a secondary donor.

[9]     Sergeant Longmire had followed up on information from Officer Bukala that Alonzo had filed two police reports and applied for victim relocation funds shortly before her disappearance by talking to Sergeant Ferguson, but failed to generate any leads. He acknowledged at trial that he did not know Alonzo's application for relocation funds had been granted on November 17, 2004, although this information was noted in Officer Bukala's missing-person report.

[10]     *Miranda v. Arizona* (1966) 384 U.S. 436.

10

met her through a man named Darryl White. Later, defendant said he had been going out with Alonzo for a couple of months when she disappeared. Defendant acknowledged Terresa came to his house looking for Alonzo, and insisted he had not seen Alonzo since the "wintertime somewhere between Thanksgiving and Christmas" or between September and October. Defendant said he had last seen Alonzo on Grove Street, near her home. Later, defendant told him that he last saw Alonzo when dropping her off on Athens Street "well before Thanksgiving." At some point, Sergeant Longmire indicated Alonzo was not still missing, to which defendant responded: "So she's dead?" When Sergeant Longmire confronted defendant with the fact that Alonzo's blood had been found in his bedroom, he denied knowing how this could have happened. Defendant explained that he had left the area for Nevada "when things got hot because of [Alonzo's] disappearance."

After defendant's arrest, Sergeant Longmire obtained a warrant to search his house and blue Mercedes. However, when Sergeant Longmire arrived at the house on February 27, 2007, it was mostly empty. He then got warrants for both Mark and defendant's DNA. Subsequent testing revealed blood on the door between defendant's bedroom and the laundry room matched the DNA of both defendant and Mark (with defendant identified as the donor of the higher of two blood stains on the door, and Mark identified as the donor of the lower blood stain).

While defendant was in jail under arrest, recordings were made of his phone conversations with Haymon. In one of these conversations, defendant insisted to Haymon that he had sanded the entire floor, not just certain sections. He also insisted knowing nothing about the presence of Alonzo's blood in his house, telling Haymon it was likely a police trick, rather than an actual fact.

The police also interviewed Diana Yonkouski, the realtor hired to sell Mark and defendant's house. Yonkouski first met Mark to discuss selling the house in Spring 2004. At this time, she recommended doing some work on the house before putting it on the market. In particular, she recommended painting the exterior. She did not, however, recommend any specific work inside the house.

11

When Yonkouski later visited the house in November 2005, she noticed someone had covered the vents around the bottom of the house, something she would never recommend due to the need to ensure proper ventilation in this area. Also in 2005, Yonkouski noted an "unusual odor" coming from underneath the house, and instructed them to clean out the basement.

Yonkouski first met defendant in person at the house in 2006. Her handyman submitted a proposal to paint the interior and refinish the floors on May 29, 2006, and the house was then listed in November 2006. In the disclosures prepared for the buyer, Yonkouski noted that two large holes had been dug in the sub-basement of the house, which had been covered with boards. She described the larger of these holes as five feet by three or four feet in width and two to three feet in depth. She also noted a large concrete slab in the sub-basement that served no apparent structural purpose.

At trial, Yonkouski described a conversation with defendant during the 2006 home inspection. He told her with a "little smirk" on his face that, when you put a certain chemical on a body, it will disintegrate. Yonkouski could not recall what prompted defendant's comment, or what chemical he named. She did recall he made the comment when they were standing in an unfinished storage area in the house. Sergeant Longmire later testified that he did not recall Yonkouski telling him about defendant's comment.

Also testifying at trial was Patrice Fluker, a former inmate who met defendant in a holding cell at the Oakland jail in February 2007. Fluker later served time with defendant at the Santa Rita jail. According to Fluker, defendant offered to compensate him for his help using the telephone. Fluker had an advantage over defendant in getting phone reservations due to his gang affiliation.

Fluker knew defendant had been charged with Alonzo's murder, and had met Alonzo once or twice through her daughter, Lashawn, who was his close friend. Defendant asked Fluker to testify at his preliminary hearing that he had seen Alonzo on a particular date in November 2004 in exchange for $1,000. Fluker agreed, telling defendant that he would falsely testify that he was with Alonzo (and others) on

November 24, 2004, the day before Thanksgiving. He also agreed to testify that Alonzo was, among other things, a prostitute, crack head, and scam artist.[11]

Fluker testified that defendant had repeatedly talked about Alonzo in the past tense and referred to her as "the bitch." Once, after defendant learned that police had found Alonzo's blood in his house, he told Fluker: "The bitch is still haunting me even from her fucking grave." When Fluker told defendant that police could use Luminal to find blood, he responded: "Not with what I used." He also told Fluker that the police had searched his house with cadaver dogs, but had found nothing.

Later, Fluker saw defendant in a holding cell during defendant's preliminary hearing. Defendant told him that their concocted story about seeing Alonzo on November 24th would not work in light of testimony from Alonzo's neighbor. He asked Fluker to instead testify that he saw Alonzo on November 25th, Thanksgiving Day. Defendant also told Fluker that he had given the "evil eye" to a woman who had just testified at his hearing, which made the witness cry.[12]

Ultimately, after being transported to court several different days for defendant's preliminary hearing, Fluker decided not to provide the false testimony.[13] After telling defendant his decision, he was brought to the court room to talk to defendant's attorney. Fluker told defense counsel he would not testify as planned because it was untrue. Fluker was then visited by deputy district attorney, Casey Bates, and an investigator, who asked why he had decided not to testify. Fluker acknowledged having concocted a false story with defendant, and then changing his mind about telling it in court. Fluker later saw

---

[11] According to Fluker, Lashawn's girlfriend, Carla, told him she went to Alonzo's mother's house for Thanksgiving 2004, and had fallen asleep there. Defendant encouraged Fluker to say he had been with Alonzo, Lashawn, Carla and another person on Thanksgiving, and to add the detail of Carla having fallen asleep to make his testimony more realistic.

[12] Other evidence reflected that Fluker and defendant were transported to court together on September 5, 2007 for defendant's preliminary hearing, and that Alonzo's neighbor, Easley, had cried on the witness stand that day.

[13] At trial, Fluker explained that, had he testified as planned about Alonzo, he would not have been able to face Lashawn.

13

defendant in a holding cell after continuing to be called for his preliminary hearing. Defendant offered him $5,000 to testify to having seen Alonzo on November 25, 2004. When Fluker asked defendant whether he killed Alonzo, defendant responded: "Yeah."

Fluker, who had already been sentenced at the time of his meeting with Bates, did not ask for or receive any compensation or leniency. Nor did Fluker ask for or receive leniency when he later testified at the preliminary hearing for the prosecution (something he had never done before). In fact, because he cooperated with the prosecution, Fluker was disaffiliated from his gang and a "green light" was placed on him, meaning gang members were supposed to attack him upon crossing his path. Ultimately, Fluker was placed in protective custody in prison, and was stabbed several times. Out of concerns for Fluker's safety, the district attorney's office helped him transfer his parole out of Oakland. The district attorney's office also gave him financial assistance to resettle elsewhere, as well as financial assistance when he was released from custody until his social security benefits resumed. Bates helped Fluker obtain a photograph of the deceased mother of his children.

At trial, Bates confirmed Fluker did not initiate contact with his office, nor receive anything of value in exchange for cooperating in defendant's case. Bates decided to meet with Fluker after seeing Fluker and defense counsel talking in the holding cell and then being told by defense counsel that Fluker would no longer be called as a defense witness. At their meeting, Fluker told Bates that defendant offered to pay him to falsely testify that he had seen Alonzo in November 2004. Fluker was told by defendant, not Bates, that Easley cried on the stand and that Easley and Hall had changed the date on which they said they last saw Alonzo. Bates acknowledged later testifying on Fluker's behalf at a parole revocation hearing. He testified about the safety repercussions of Fluker's decision to cooperate with the prosecution in defendant's case. Bates believed Fluker had an expectation of receiving protection in exchange for testifying, but he did not ask for leniency on Fluker's behalf at the hearing.

Following closing arguments and instruction by the court, the jury deliberated for three days. Finally, on February 28, 2012, the jury rendered its verdict, finding defendant

14

guilty of second degree murder. The trial court thereafter sentenced defendant to 15 years to life in prison. This timely appeal of the judgment followed.

## DISCUSSION

Defendant raises numerous issues for review. Defendant contends the trial court committed prejudicial error by: (1) infringing on his right to a public trial by imposing certain restrictions on his daughter, Erica, during the course of trial; (2) excluding third-party culpability evidence and related exculpatory evidence, including evidence that third parties threatened Alonzo prior to her disappearance and used her EBT card after her disappearance; (3) restricting defendant's right to confront and cross-examine Fluker, the jailhouse informant who testified that defendant admitted killing Alonzo and offered to pay Fluker to give false testimony; (4) admitting two multiple hearsay statements, including one relating to his purported admission of guilt; (5) declining to review materials he sought from the prosecution for a possible *Brady* violation; [14] (6) admitting evidence of his purported prior bad act pursuant to Evidence Code section 1109 without the requisite foundational showing; and (7) excluding evidence impeaching Sergeant Longmire. Defendant also seeks reversal of the judgment for reasons of repeated instances of ineffective assistance of counsel and prosecutorial misconduct. We address defendant's contentions below to the extent appropriate.

## I.     Exclusion of Third-Party Culpability Evidence.

We turn first to defendant's challenge to two trial court rulings to exclude evidence relating to third parties that he contends is exculpatory. Broadly speaking, the challenged rulings relate to two categories of evidence. The first category relates to evidence of threats Alonzo allegedly received from unidentified individuals and then reported to police before she disappeared. Defendant sought to admit this evidence to prove third-party culpability and, alternatively, to impeach testimony elicited from Alonzo's daughter, Terresa, denying that her mother had been threatened. The second category relates to evidence that an unidentified person used Alonzo's EBT card shortly

---

[14]     *Brady v. Maryland* (1963) 373 U.S. 83.

15

after her disappearance, which defendant also sought to admit to prove third-party culpability. The applicable law is as follows.

Where, as here, a defendant seeks to admit third-party culpability evidence, the evidence is assessed under Evidence Code section 352 to determine whether its probative value is substantially outweighed by the risk that its admission would result in undue prejudice, confusion or consumption of time. In performing this assessment, the basic issue presented for the court is whether the excluded evidence is " 'capable of raising a reasonable doubt of [the] defendant's guilt.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [probative value outweighs prejudice where third-party culpability evidence suffices to raise reasonable doubt as to guilt], quoting *People v. Hall* (1986) 41 Cal.3d 826, 829.) Thus, as the California Supreme Court explains this standard, where there is "direct or circumstantial evidence linking the third person to the actual perpetration of the crime," the third-party culpability evidence should be admitted. Where, however, such evidence proves "mere motive or opportunity to commit the crime in another person, without more," it is properly excluded as incapable of raising a reasonable doubt as to the defendant's guilt. (*People v. Hall, supra,* 41 Cal.3d at p. 833; see also *People v. Green* (1980) 27 Cal.3d 1, 22 [third-party culpability evidence tending to exonerate a defendant is admissible only if it constitutes "substantial evidence tending to directly connect that person with the actual commission of the offense"], overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 239.) On appeal, a trial court's decision to admit or exclude third-party culpability evidence is reviewed, like other evidence, for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581.)

### 1. Third-Party Threats Received by Alonzo.

Turning to the first category of evidence, relating to third-party threats received by Alonzo, the record reflects that, in November 2004, about three weeks before she disappeared, Alonzo filed two separate police reports stating that she had twice been threatened by individuals warning her that, if her son, Tyrone, testified in an upcoming

16

murder trial, she could be harmed.[15]  The first police report made by Alonzo on November 8, 2004, stated that a man approached her on November 6, 2004, asked where Tyrone was, and then slapped her in the face before ordering her to tell him not to appear in court. A few hours later on November 8, 2004, Alonzo made a second police report, stating that, about ten or fifteen minutes earlier, outside her house, a woman had brandished a firearm at her.  A few days later, Alonzo filed a request with the Alameda County Victims of Violence Coordinator for payment of relocation expenses.  It appears her application was or would have been granted by this agency.

In seeking admission of this evidence, defendant argued below, as he does here, that it is relevant to prove someone other than him was responsible for Alonzo's death or disappearance – to wit, individuals seeking to prevent her son from testifying at a murder trial.  Defendant further argues this evidence is relevant to prove Alonzo fled the area in fear of these individuals with intent to disappear and may not have been murdered at all.  Alternatively, he argues the evidence was admissible to cross-examine Officer Bukala regarding whether he properly investigated the case by following up on the threats documented in Alonzo's police reports.[16]

---

[15]  Alonzo's son, Tyrone, had been a victim of a drive-by shooting in April 2004 that resulted in the death of one of his friends.  He was subsequently served with a subpoena to testify at the suspect's murder trial.

[16]  In a new, but related, variation of his argument at trial, defendant insists on appeal that the police report evidence is probative of Alonzo's state of mind and, in particular, her motive to flee the area, and that his trial counsel rendered ineffective assistance by failing to pursue this theory when seeking admission of this evidence at trial.  He thus acknowledges his trial counsel's failure to raise a valid objection.  As the record reflects, however, defense counsel raised several alternative grounds in seeking to admit this evidence, including that the evidence is admissible to prove third-party culpability, as spontaneous statements by Alonzo, or to cross-examine the investigating officers regarding the scope of their investigation.  In asserting these various grounds, defense counsel made clear to the trial court that he considered this evidence "the most critical thing about this case" given his defense that defendant was not responsible for Alonzo's disappearance or death.  The court, however, refused to admit the evidence, reasoning that, "generally," the case law "almost requires the defense to do their own investigation on who committed the murder and come up with a specific person."  Given this record, we conclude defense counsel's failure to separately raise Alonzo's state of mind as a

The trial court excluded this evidence, reasoning that, under California law, "you have to have basically a specific person who had the opportunity, the motive. I mean you don't have to, but that's generally what the cases say. . . . [The law] almost requires the defense to do their own investigation on who committed the murder and come up with a specific person," citing *People v. Hall, supra,* 41 Cal.3d 826. Nevertheless, the trial court did permit defense counsel to cross-examine Sergeant Longmire, the homicide detective, regarding his awareness of Alonzo's November 2004 police reports. Defense counsel was also permitted to elicit testimony from Sergeant Longmire that Alonzo made the reports and applied for relocation money from a county agency supporting victims of violent crimes. However, pursuant to the court's *in limine* ruling, defense counsel could not question Sergeant Longmire regarding the substance of Alonzo's reports or her reasons for seeking relocation funds.

In addition, defense counsel questioned Alonzo's daughter, Terresa, about these threats. During Terresa' cross-examination, defense counsel elicited testimony that Terresa did not believe her mother's request for relocation funds had anything to do with any threats made against her, and that Terresa had no personal knowledge of her mother being threatened. However, pursuant to the trial court's ruling, defense counsel could not then impeach Terresa with the police reports indicating Alonzo was threatened.

In assessing the excluded evidence for purposes of appeal, the law requires us to decide whether it is " 'capable of raising a reasonable doubt of [the] defendant's guilt,' " and whether, under Evidence Code section 352, the probative value of the evidence is substantially outweighed by its prejudicial value. (*People v. Cudjo, supra,* 6 Cal.4th at p. 609, quoting *People v. Hall, supra,* 41 Cal.3d at p. 833.) In doing so, we keep in mind the evidence must go beyond proving mere motive or opportunity to commit the crime;

basis to admit the evidence is excusable. Simply put, given that the trial court had already rejected several arguments raised by defense counsel and had clearly decided the evidence would not come in, we conclude another objection to its exclusion, this time on the basis of state of mind, would likely have been futile. (See *People v. Lucas* (1995) 12 Cal.4th 415, 457.)

rather, there must be direct or circumstantial evidence linking the third person or persons to perpetration of the crime. (*People v. Hall, supra,* 41 Cal.3d at p. 833.)

Applying this standard to the facts at hand, we begin with an undeniable fact: This case is quite unique. As mentioned above, neither the victim's body nor the murder weapon was ever found, leaving a plethora of unanswered questions regarding her disappearance and death. In fact, there is no direct evidence that Alonzo is dead, much less direct evidence of the cause of her death. Rather, the record reflects she disappeared one day, never to be seen or heard from again.

At the same time, the evidence of defendant's guilt is mostly, if not entirely, circumstantial. Defendant's purported admission of guilt came from the mouth of, not just a career felon, but someone who admittedly distorts the truth to further his own self interests. And defendant's motive to kill Alonzo was never pinned down.[17] There is evidence of defendant behaving oddly after Alonzo disappeared – including very nervous interactions with police and haphazard cleaning and construction work on his house immediately after her disappearance. And there is evidence of bloodstains in the house, including stains consistent with Alonzo's DNA in clothing found in the laundry room. And there is evidence of volatility in their relationship, including evidence that defendant was verbally and physically abusive toward her on at least one occasion when, according to her neighbor, defendant grabbed her arm and said, "bitch, get in the car." However, there is no evidence that defendant had ever caused her physical injury, or that she feared he would.

Thus, while under ordinary circumstances, the probative value of evidence that a third party made a threat or had reason to kill the victim is often substantially outweighed by the prejudicial impact of such evidence, in this case, we conclude the probative-prejudice scale strikes a different balance. (See *People v. Hall, supra*, 41 Cal.3d at p. 834.) Given the sheer number of unknowns regarding the nature of Alonzo's disappearance and death, the third-party culpability evidence in this case – consisting of

---

[17] There is some evidence that defendant may have owed or promised Alonzo money.

multiple third-party threats that Alonzo believed related to her son having been subpoenaed at a murder trial and contemporaneously reported to police – has particular relevance and materiality that suffices to outweigh any risk of undue delay, prejudice, or confusion arising from its admission. (See Evid. Code, § 210 [relevant evidence is that which has any tendency in reason to prove or disprove a disputed material fact].) Moreover, the evidence is probative on the very issue at the heart of the defense – to wit, whether someone besides defendant caused Alonzo's death or disappearance. Significantly, the excluded evidence reflects that, at the time of Alonzo's disappearance, Alonzo was in fact fearful; yet, the fear she expressed to others was not fear of defendant, but fear of these individuals who had threatened her. Under these circumstances, we conclude a reasonable juror could doubt defendant's guilt on the basis of this evidence.

In reaching this conclusion, we reject several arguments put forth by the prosecution in seeking affirmance of the trial court's ruling. First, the People argue this evidence is merely indicative of third-party motive, not third-party culpability, and thus is insufficient to warrant its admission. In support of this contention, the People point to their pre-trial offer of proof indicating Alonzo could not describe or identify the male who allegedly threatened and slapped her on November 6, 2004, and that, according to Alonzo's son, Tyrone, when he chased down the woman who threatened Alonzo with a gun in front of their house on November 8, 2004, this woman apologized and showed him her gun was plastic. Alonzo's son also denied receiving any threats relating to the murder trial for which he was ordered to testify. The prosecution's offer of proof further states that both Alonzo's son and the claims specialist who reviewed her application for relocation fees believed Alonzo fabricated being threatened to qualify for the funds.[18] Consistent with this offer of proof, Terresa testified that her mother did not receive any threats, that she would know if her mother had been threatened, and that her mother's

_____

[18] According to the claims specialist, Alonzo made the police reports within a week of being advised by the county that she would not qualify for the funds unless her son's life or her own life was in actual danger.

20

request for relocation funds had nothing to do with threats but, rather, with her general worry about neighborhood safety.[19]

We agree with the prosecution the facts set forth in its offer of proof call into question the credibility of Alonzo's police reports. However, the evidence is also relevant to the substantive issue of whether someone other than defendant murdered or caused the disappearance of Alonzo. "As Wigmore observed, 'if the evidence is really of no appreciable value no harm is done in admitting it; but if the evidence is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.' (1A Wigmore, Evidence (Tillers rev. ed. 1980) § 139, p. 1724.)" (*People v. Hall, supra*, 41 Cal.3d at p. 834. See also *People v. Alcala* (1992) 4 Cal.4th 742, 790 [where defendant was convicted of kidnapping and murdering a young girl, the trial court erred in excluding testimony under section 352 from a witness who claimed to have seen the girl on a certain day, thereby raising the possibility that another person killed her, because: "Although the court was vested with wide discretion in determining the relevance and weighing the prejudicial effect of proffered evidence against its probative value [citation], the circumstance that [the witness's] testimony readily was subject to impeachment did not afford the court a legitimate basis for excluding this evidence"].)[20] Thus, we disagree the prosecution's showing warrants

---

[19] Nor could Officer Bukala find any link in his investigation between Alonzo's disappearance and her son's witnessing the murder.

[20] As the prosecution notes, defense counsel elicited Terresa's testimony that she was unaware of any threats received by her mother, that she would know if her mother had been threatened, and that her mother's request for relocation funds had nothing to do with any threats. Defendant nonetheless complains that his attorney was thereafter precluded by the trial court's *in limine* ruling from confronting Terresa with the evidence that Alonzo filed the police reports stating that she had twice been threatened. Regardless of whether defense counsel "invited" prejudice by eliciting this testimony in light of the trial court's ruling to exclude the police report evidence, the fact remains that the jury should have been permitted to weigh Terresa's testimony that Alonzo was not threatened against the evidence that Alonzo reported two threats to the police. (See Evid. Code § 780, subd. (i) ["Except as otherwise provided by statute, the court or jury may consider in

21

exclusion of the police reports from trial.[21]  As the California Supreme Court cautions, "trial courts [must] avoid hasty conclusions that third-party-culpability evidence is 'incredible'; this determination, we have affirmed, 'is properly the province of the jury.' (*People v. Hall, supra*, 41 Cal.3d at p. 834.)"  (*People v. Cudjo, supra*, 6 Cal.4th at p. 610 [holding the trial court abused its discretion in excluding highly probative and highly necessary third-party culpability evidence after concluding "that doubts about [the witness's] credibility, though reasonable and legitimate, did not provide a sufficient basis to exclude his testimony"].)  The California Supreme Court also cautions that "inquiry into the admissibility of [third-party culpability] evidence and the balancing required under section 352 will always turn on the facts of the case . . . [and] courts must weigh those facts carefully."  (*People v. Hall, supra*, 41 Cal.3d at p. 834.)  Here, for all the reasons stated above, we believe the exceptional facts of this case require admission of this third-party culpability evidence.

Moreover, we disagree with the prosecution that the California Supreme Court case, *People v. Edelbacher* (1989) 47 Cal.3d 983, dictates a different result.  There, the defense sought to introduce evidence that the murder victim had been hanging around "Hells Angel-type people" and had sought several times to buy marijuana.  The reviewing court upheld the trial court's exclusion of this evidence, explaining that, at most, the excluded evidence demonstrated a possible motive for the victim's murder; "[a] fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible."  (*Id.* at pp. 1017-1018

---

determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to . . . [¶] . . . [¶] The existence or nonexistence of any fact testified to by him"].)

[21]     The People also argue Alonzo's police reports are inadmissible hearsay. However, as defendant notes, Alonzo's statements are probative of her fearful state of mind at the time of her disappearance, and thus would not be made inadmissible by the hearsay rule pursuant to Evidence Code section 1250.  Alternatively, Alonzo's second police report, in which she stated that, just minutes earlier, a women had brandished a gun at her appears to be admissible as a spontaneous statement pursuant to Evidence Code section 1240.

[explaining the third-party culpability evidence must "link" the third party to the commission of the relevant crime].)  Our case is distinguishable from *People v. Edelbacher* in significant ways.  First, contrary to that case, there is evidence of an actual motive in this case by the third-party individuals – to wit, to prevent her son from testifying at an upcoming murder trial.  In addition, we have the fact that the alleged third-party threats occurred within just weeks of Alonzo's mysterious disappearance, a temporal proximity adding probative value to the excluded evidence.  (Cf. *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 ["[the victim's] statements that she *previously* had been in fear of 'a man' clearly were insufficient to link someone other than defendant to the actual perpetration of [her] murder"].)  And finally, we have the fact that these threats were contemporaneously documented in police reports filed by Alonzo, an information source generally deemed reliable.  Thus, the People's authority does not sway us from the view that this evidence suffices to raise a reasonable doubt as to defendant's guilt, such that the jury should have been permitted to consider it.  (See *People v. Jackson* (1991) 235 Cal.App.3d 1670, 1679 [" '[A] defendant's due process right to a fair trial requires that evidence, the probative value of which is *stronger* than the *slight-relevancy* category and which tends to establish a defendant's innocence, cannot be excluded on the theory that such evidence is prejudicial to the prosecution' "].)

Finally, we conclude the trial court's erroneous exclusion of this third-party culpability evidence was prejudicial to defendant.  To summarize what we have just discussed at length, exclusion of this evidence deprived defendant of the opportunity to demonstrate to the jury that, around the time of Alonzo's disappearance, other individuals with wholly distinct motives (to wit, preventing her son from testifying in an unrelated murder case) were threatening to harm her.  The excluded evidence tended to prove that Alonzo may have been killed by one of these individuals or their associates, or that she disappeared on her own volition out of fear of these individuals.  Not only are these theories plausible, the excluded evidence upon which they are based was memorialized in official police reports, an ordinarily reliable information source.  And while the prosecution is quick to note there is evidence Alonzo may have falsified or at least

23

exaggerated these police reports in order to secure relocation funds, as stated above, this conflicting evidence should have been left for the jury to sort out. This is particularly true in light of the highly circumstantial nature of this case, where, as mentioned earlier, no body was ever found and the only direct evidence of guilt came in the form of statements by Fluker, a career felon who admittedly manipulated the truth to serve his own interests. The fact that the jury deliberated for three days before reaching a guilty verdict, even without this evidence, reflects what a close case this was.

Thus, in light of all of these relevant circumstances, we are left to conclude that it is reasonably probable a result more favorable to defendant would have been reached in the absence of the trial court's error in excluding this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 837; see also *People v. Hall, supra*, 41 Cal.3d at p. 836 [applying the *People v. Watson* standard in assessing prejudice from the wrongful exclusion of third-party culpability evidence].)[22] Accordingly, reversal for new trial is warranted.

---

[22] Defendant relies upon *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), to argue that, where exclusion of evidence violates a defendant's right under the United States Constitution to present a defense, reversal is required unless the prosecution proves the error harmless beyond a reasonable doubt. However, as the California Supreme Court has explained, in the vast majority of cases involving a defendant's challenge to exclusion of evidence, the constitutional right to present a defense is not implicated: " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] . . . [T]his principle applies perforce to evidence of third-party culpability . . . .' (*People v. Hall, supra,* 41 Cal.3d at pp. 834-835.) [¶] It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution. Even in capital cases, we have consistently assumed that when a trial court misapplies Evidence Code section 352 to exclude defense evidence, including third-party-culpability evidence, the applicable standard of prejudice is that for state law error, as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (error harmless if it does not appear reasonably probable verdict was affected)." (*People v. Cudjo, supra,* 6 Cal.4th at pp. 610-611.) Accordingly, we reject defendant's argument that *Chapman* applies.

## 2. Third-Party Use of Alonzo's EBT Card.

Turning now to the second category of third-party culpability evidence, relating to someone's use of Alonzo's EBT card after she disappeared, the relevant record is as follows. Officer Bukala received information during his missing-person investigation from an employee at Captain's Liquors, a store frequented by both Alonzo and defendant, that a "male black, five-ten with dreadlocks" used what he believed was Alonzo's EBT card at the store in early December 2004.[23] This employee, who had returned to his native country of Yemen and could not be reached by the time of trial, told Officer Bukala that he recalled seeing this man and Alonzo together in the past. Below, defendant argued this evidence was admissible to prove third-party culpability, as well as to counter the prosecution's evidence that Alonzo's EBT card was used shortly after her disappearance and that a person with knowledge of an EBT card PIN number could access money on the card or check its balance without actually possessing the card.[24] The trial court excluded the evidence as "too vague," while permitting defense counsel to question Officer Bukala more generally regarding whether he received and pursued information that Alonzo's EBT card was used after she disappeared.

Applying the above-stated rules governing third-party culpability evidence, we find no grounds for disturbing the trial court's ruling to exclude this evidence, as it is insufficient to raise a reasonable doubt as to defendant's guilt. (*People v. Hall, supra*, 41 Cal.3d at p. 833.) The trial court could reasonably conclude that this evidence is too vague and circumstantial to carry much probative weight, while, at the same time, that its admission would carry significant risk of engendering undue prejudice and confusion. Not only is the store clerk in Yemen and unavailable to testify (raising hearsay concerns), the information he purportedly gave Officer Bukala is not clearly linked to Alonzo's

---

[23] Defendant is a white man without dreadlocks.

[24] The court rejected defendant's argument that testimony from prosecution witness, Roberta O'Neill, a benefits specialist with the Alameda County Social Services Agency, that someone could access money or balance information on Alonzo's EBT card without having possession of her card opened the door to evidence that another man was seen using her card after she disappeared.

25

murder. Rather, the record merely reflects the clerk believed the EBT card used by the dreadlocked man may have been Alonzo's card because of a crack in it, yet he did not actually verify the name on the card. At most, this information of the possible use of Alonzo's card by someone other than defendant may suggest a potential motive or opportunity to harm Alonzo; however, as stated above, "[a] fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*People v. Edelbacher, supra,* 47 Cal.3d at pp. 1017-1018 [explaining the third-party culpability evidence must "link" the third party to the commission of the relevant crime].)

In any event, even assuming for the sake of argument this evidence should have been admitted, we would nonetheless find no resulting harm. As mentioned above, the jury heard evidence that several balance inquiries were made on Alonzo's EBT card after her disappearance, and that Officer Bukala investigated the complete transaction histories of both Alonzo's and defendant's EBT cards, but was unable to generate any significant leads. In light of these facts, and given the vagueness surrounding the store clerk's report of having seen the dreadlocked individual use a cracked EBT card that he believed resembled Alonzo's card, we conclude it is not reasonably probable a result more favorable to defendant would have been reached had this evidence been admitted.[25] (*People v. Watson, supra,* 46 Cal.2d at p. 837; see also *People v. Hall, supra*, 41 Cal.3d at p. 836 [applying the *People v. Watson* standard in assessing prejudice from the wrongful exclusion of third-party culpability evidence].)

## II.    Other Issues Likely To Occur On Retrial.

In view of our conclusion that reversal is necessary based upon the trial court's prejudicial error in excluding evidence of third-party threats received by Alonzo, we need not discuss at length all of defendant's remaining contentions on appeal. Instead, we address only those likely to occur on retrial.

---

[25]    Our conclusion in this regard is without prejudice to defendant's right to seek admission of this evidence on retrial, should additional grounds for establishing its relevance become apparent.

**A.     Restrictions on Defendant's Cross-Examination of Patrice Fluker.**

Defendant first challenges as prejudicial error certain restrictions the trial court imposed with respect to his right to cross-examine Fluker, the jailhouse informant who testified that defendant admitted killing Alonzo and offered to pay him to provide false testimony about having seen her on Thanksgiving Day 2004.

The relevant law is not in dispute.  "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.)  However, at the same time, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier this Term, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]" (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679.)  Thus, cross-examination is generally deemed sufficient unless "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." (*Id.* at p. 680.)

In this case, the trial court imposed the following restrictions on defense counsel's cross-examination of Fluker.  First, the trial court barred defense counsel from asking Fluker whether he had been arrested for murder.  Second, the court barred him from asking Fluker whether he continued to sell narcotics in or after 2009.  Third, the trial court limited inquiry into the details of Fluker's 13 arrests that occurred after defendant's preliminary hearing.  And, finally, the trial court barred defense counsel from inquiring as to whether deputy district attorney Casey Bates had provided favorable testimony at Fluker's parole hearing in exchange for his testimony in this case.  According to

27

defendant, these restrictions impermissibly infringed upon his constitutional right of confrontation. We disagree.

First, with respect to the ruling barring defense counsel from asking Fluker whether he had been arrested for murder, as the People note, defense counsel made no offer of proof demonstrating this highly inflammatory fact was true. Moreover, while a defendant's prior felony conviction is generally admissible as impeachment evidence (Evid. Code, § 788), the same is not true for a defendant's prior felony arrest. In any event, the record makes clear that Fluker's lengthy and serious criminal history was the subject of extensive questioning by counsel. Among other things, Fluker was asked about the facts that he: (1) had been in prison for at least 20 of the last 27 years; (2) had been arrested about 100 times; (3) was affiliated with the 415 gang; (4) was convicted on five counts of robbery before his 20th birthday, several counts of which involved his use of a gun; (5) after serving time for these robberies, was convicted of selling cocaine; (6) after serving time for selling cocaine, was convicted of assault with a deadly weapon; (7) continued to sell drugs at least through 2008; (8) was convicted of dissuading a witness; (9) had about 19 aliases and often gave false names during arrests to avoid detection on warrants; and (10) was a longtime alcoholic and drug addict who smoked cocaine in 2004.

Further, with respect to the restrictions placed on Fluker's cross-examination regarding his involvement in the narcotics trade in and after 2009, defendant disregards that the following questions were in fact permitted. Among other things, defense counsel asked whether Fluker had sold drugs "since 2004" (to which Fluker responded, "Yes"), and whether he had sold drugs in 2005, 2006, 2007 and 2008 (to which Fluker responded, "Probably"). It was not until this point that the prosecutor successfully objected on relevance grounds to defense counsel's further inquiries into whether Fluker sold drugs in 2009 and when he stopped selling drugs. However, given that the jury was clearly exposed to a wealth of testimony regarding Fluker's drug dealing, and given the lack of relevance of his drug dealing beyond the general issue of credibility, we conclude the trial court's ruling was neither erroneous nor prejudicial. (See *People v. Burgener* (1986)

28

41 Cal.3d 505, 525 [trial court has discretion to exclude marginally relevant evidence where its probative value is outweighed by the risk of necessitating an undue consumption of time], overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

Next, addressing the trial court's limitations on questioning Fluker on the details of his 13 post-preliminary-hearing arrests, defendant claims it precluded him from exposing an "unexplained pattern of leniency" by law enforcement towards Fluker.[26] However, defendant's argument ignores that his counsel was granted permission by the trial court to discuss the details of Fluker's arrests with his parole officer, even though he was not entitled to the actual arrest reports. Defense counsel was also permitted to cross-examine Fluker regarding whether he had received any "inducements or incentives" for cooperating with the prosecution in this case. Indeed, Fluker's cross-examination revealed the following facts suggestive of bias: (1) Bates granted Fluker's request for a photograph of the deceased mother of his children; (2) Bates granted Fluker's request to be placed in a witness relocation program subject to the requirement that he testify truthfully and obey all laws; (3) Fluker had violated the law since his agreement with Bates regarding his placement in the witness relocation program; (4) Bates granted Fluker's request to testify on his behalf at a parole hearing; (5) he later wrote Bates to thank him for testifying at his parole hearing and, in this letter, suggested that his testimony helped him get a shorter parole revocation term; (6) he wrote Bates to tell him that he would do what was needed to get into the witness relocation program, including altering the truth and compromising his integrity; and (7) he then wrote Bates again, stating: "If by the time I'm released if your office isn't prepared to ensure my safety, don't risk calling your case because I assure you I will stomp you so badly he'll walk." Given this record, the trial court's imposition of some limits on counsel's ability to explore Fluker's potential bias was wholly reasonable. (See *Delaware v. Fensterer*

---

[26] The court also sustained the prosecution's objections to questions as to whether Fluker violated probation between his first and second prison terms, or was arrested after his release from prison after defendant solicited his testimony.

(1985) 474 U.S. 15, 20 ["the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish"].)

And, similarly, in challenging the trial court's decision to bar defense counsel from inquiring as to whether Bates provided favorable testimony at Fluker's parole hearing in exchange for his testimony in this case, defendant ignores that Fluker was in fact questioned on whether Bates provided helpful testimony at his parole hearing. Indeed, he readily admitted this fact. While it is correct defense counsel was not permitted to directly ask whether this helpful testimony was in exchange for Fluker's testimony in this case, as the record above indicates, defense counsel's cross-examination cannot be deemed constitutionally inadequate, particularly where Fluker himself admitted mixing fact and fiction "if it's required"; lying to the investigator when telling him the story he had concocted with defendant (to wit, that he had seen Alonzo on November 24 or 25, 2004); and possessing the ability to lie easily in certain situations. (See *Delaware v. Fensterer, supra,* 474 U.S. at p. 20.)

Thus, in light of the by-all-means extensive examination into Fluker's criminal background, his general views on truthfulness and, more specifically, telling the truth under oath, and his reasons for cooperating with the prosecution in this case, we reject defendant's Sixth Amendment challenges to the limitations placed on Fluker's cross-examination. Indeed, the essence of defendant's argument on this issue is that, had the jury heard the excluded evidence, it "would have had a drastically different view of Fluker's credibility." However, as the record from above makes painfully clear, the jury already had myriad – indeed, undisputed – reasons to discredit Fluker's testimony, including his admitted willingness to lie under oath for personal advantage, his lifelong flouting of the law, and his general disrespect of legal and societal institutions. We are, thus, at a loss as to understand how any of the excluded evidence, whether viewed separately or collectively, could have "drastically" changed the jury's impression of this witness. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 624 [the trial court's ruling to bar cross-examination of a witness regarding his bribery of two judges in other

30

proceedings did not violate the confrontation clause where the witness's credibility had already been extensively impeached, including the witness's admissions of numerous prior acts perjury, bribery and/or coaching of others to commit perjury, and extensive involvement in the drug trade].)  No grounds therefore exist for disturbing the trial court's decisions.

**B.     The Trial Court's Rulings on Defendant's Claims of *Brady* Error.**

In a related argument, defendant contends the trial court's refusal to order the prosecution to disclose certain evidence relating to Fluker's post-preliminary hearing arrests (to wit, complete law enforcement records of his parole violation history) constitutes reversible error under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id*. at p. 87.)  Here, defendant claims he was entitled to information regarding the details of Fluker's arrests because, if any of these arrests involved crimes of moral turpitude, they could be used to impeach Fluker or to prove he was shown "obvious leniency" from the district attorney's office based on his willingness to testify.[27]

California law is clear, however, that " 'the prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense' [citation], since 'the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.' [Citation.]

---

[27]     In response to a defense request, the prosecution agreed to provide a synopsis of Fluker's parole history.  The prosecutor thereafter represented to the court that defense counsel had been given a complete history of Fluker's in-custody and out-of-custody status from 2007 through the present (February 16, 2012), but that she did not have access to this information for other counties or non-California facilities.  The prosecutor also represented that, had any of Fluker's arrests involved crimes of moral turpitude (they did not), she would have disclosed such fact during discovery.  The court ultimately ruled that *Brady* had been satisfied, noting that, although defendant was not entitled to all of Fluker's arrest records, he could inquire whether Fluker had received any inducements of incentives in exchange for his testimony.

31

Rather, a [*Brady*] violation occurs " 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)" [¶] " '[Moreover,] [i]n general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987); *see also Giglio v. United States*, 405 U.S. [150,] 154-155 [31 L.Ed.2d 104, 92 S.Ct. [763,] 766 [(1972)] (*Brady* violation found where government failed to disclose promise not to prosecute cooperating witness on whom government's case against defendant "almost entirely" depended), or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, *see United States v. Badalamente*, 507 F.2d 12, 17-18 (2d Cir. 1974) (same re nondisclosure of "hysterical" letters that would have had "powerful adverse effect" on witness's credibility, where that credibility was "crucial to the determination of [the defendant's] guilt or innocence"); *cert. denied*, 421 U.S. 911 [43 L.Ed.2d 776, 95 S.Ct. 1565 (1975)]." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049-1050.)

Thus, "[a]lthough the term '*Brady* violation' is often broadly used to refer to any failure on the part of the prosecution to disclose favorable information to the defense, a true violation occurs only if three components coexist: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 . . . .)" (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1474. See also *People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 51 [" 'the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial' "].)

Here, defendant cannot make this required showing. Even assuming for the sake of argument that defendant is correct that information regarding Fluker's 13 post-

preliminary-hearing arrests would have revealed a pattern of leniency toward Fluker by the prosecution, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense." [Citation.]' [Citations.]" (*Meraz, supra*, 163 Cal.App.4th at p. 52.) "As we have described it in terms of posttrial analysis of nondisclosure, ' "[m]ateriality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], *or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial'* [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]' [Citation.]" (*Meraz, supra*, 163 Cal.App.4th at p. 52 [italics added].) In this case, there is no reasonable probability of a different result. As explained above in connection with defendant's challenges to the restrictions placed on Fluker's cross-examination, the record here is full of evidence regarding Fluker's lack of credibility and his personal interest in assisting the prosecution in hopes of obtaining leniency in his own case. (Pp. 26-31, *ante*.) Moreover, although defense counsel was not granted access to the requested law enforcement records, he was permitted to question Fluker's parole officer about his post-preliminary-hearing police records and to subpoena his state prison records.

More generally, defense counsel was permitted to question Fluker at length regarding any incentives or inducements he received from the prosecution in exchange for his testimony. As stated above, Fluker admitted Bates testified favorably at his parole hearing, a fact disclosed by the prosecution prior to trial.[28] Under these circumstances, defendant's claim of *Brady* error fails for lack of any showing of a reasonable probability that he would have achieved a better result in this trial had the requested materials about Fluker been disclosed. (See *People v. Salazar, supra,* 35 Cal.4th at p. 1050 [" 'impeachment evidence has been found to be material where the witness at issue

---

[28] The prosecution had already disclosed materials indicating Bates had provided helpful testimony to Fluker in his parole hearing.

"supplied the only evidence linking the defendant(s) to the crime," [citations] . . . , or *where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case*"] [italics added].)[29]  We hasten to add in closing, however, that our conclusion in this regard is based upon the record in this trial, and is without prejudice to defendant's right to seek disclosure of information related to Fluker's criminal records, if appropriate, on retrial.

### C.  Admission of Evidence of Prior Act of Domestic Abuse.

Defendant also contends the trial court committed prejudicial error by permitting Roderick Stanley, Alonzo's neighbor, to testify over defense objection regarding an incident in which he allegedly saw defendant grab Alonzo by the arm and tell her, "Bitch, get in the car."  Stanley explained that defendant "just grabbed" Alonzo by the arm and "put her in his car," while Alonzo was fussing "like she didn't want to go."  Stanley added:  "You know, she's pretty feisty anyway, so it wasn't easy."  In deciding to admit this evidence, the trial court denied defense counsel's pretrial request for a hearing pursuant to Evidence Code section 402 to determine as a threshold issue whether Stanley's testimony was sufficiently reliable to warrant admission.

Generally, all relevant evidence is admissible.  (*People v. Champion* (1995) 9 Cal.4th 879, 922.)  Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case.  (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]  The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.)  Moreover, even relevant evidence may nonetheless be excluded if the trial court finds that its probative value is

---

[29]    We also reject defendant's claim that the trial court erred by not conducting an en camera review of Fluker's arrest files for *Brady* material.  The general process for reviewing a *Brady* claim identified by the California Supreme Court does not mention, much less require, such a review (see *In re Brown* (1998) 17 Cal.4th 873, 886), and defendant points to nothing in this case compelling deviation from the standard process.

substantially outweighed by its prejudicial effect.  (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

In this case, the testimony from Roderick Stanley was admitted pursuant to Evidence Code section 1109 (hereinafter, section 1109), which authorizes admission of a defendant's prior uncharged act(s) of domestic violence for the purpose of showing a propensity to commit such crimes.  (E.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)  More specifically, where, as here, " 'a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of  identical perpetrator and victim without resort to a "distinctive modus operandi" analysis of other factors.' (*People v. Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317]; see *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026 [92 Cal.Rptr.2d 208] ['Even before the enactment of [Evidence Code] section 1109, the case law held that an uncharged act of domestic violence committed by the same perpetrator against the same victim is admissible . . . .'].)" (*People v. Guilford* (2014) 228 Cal.App.4th 651, 661-662.)

However, even if the evidence is admissible under section 1109, the trial court must still determine, pursuant to Evidence Code section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial risk of undue prejudice, confusion of issues, or mislead the jury.  (*People v. Brown, supra*, 192 Cal.App.4th at p. 1233.)  As with other evidentiary rulings (including rulings on foundational matters), the trial court has broad discretion when making this determination, and we will not disturb the court's exercise of discretion on appeal absent a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193; *Korsak v. Atlas Hotels, Inc*. (1992) 2 Cal.App.4th 1516, 1522-1523.)

Having considered this record, we find nothing arbitrary, capricious, or patently absurd about the trial court's admission of the challenged testimony, even in the absence

35

of a pretrial hearing to address the reliability of this testimony. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.) Stanley's testimony regarding defendant pushing Alonzo and warning, "Bitch, get in the car," falls squarely within the confines of section 1109 in that the testimony described a prior uncharged act of domestic violence by defendant. (See § 13700, "(a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another. [¶] (b) 'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.") Moreover, his testimony was relevant to at least two issues ─ to wit, defendant's state of mind and propensity to commit abuse.[30] (See *People v. Brown, supra*, 192 Cal.App.4th at p. 1237 ["defendant's propensity to commit domestic violence against . . . prior girlfriends who were assaulted, is relevant and probative to an element of murder, 'namely, [his] intentional doing of an act with malice aforethought that resulted in the victim's death' "].)

Defendant insists the trial court should have held a hearing before admitting the evidence to determine the threshold issue of whether the alleged incident of domestic abuse even occurred. In doing so, defendant points to several factors undermining the probative value of Stanley's testimony, including the fact that Stanley waivered on whether defendant actually touched Alonzo during the incident and when the incident occurred. Stanley claimed to have seen the incident "two or three months" before Alonzo's November 2004 disappearance, even though he was in jail from August 2004 to April 2005. He then claimed it occurred "no more than two years before" the 2012 trial,

---

[30] Defendant also argues that section 1109 is unconstitutional because it permits the jury to infer from a defendant's prior bad act that he committed the charged offense. This argument is, of course, a nonstarter. The California Supreme Court, to which we must defer, has already decided that admission of propensity evidence pursuant to Evidence Code section 1109 and its counterpart, Evidence Code section 1108, does not violate a defendant's rights to due process and equal protection. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 915, 921; see also *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334.)

which would have been several years after her disappearance. In addition, Stanley could not initially identify defendant in the courtroom. However, despite these facts, the trial court had discretion to determine in the first instance that Stanley's testimony was sufficiently credible to be considered by the jury. (*People v. Smith* (2007) 40 Cal.4th 483, 515-516 ["Issues regarding a witness's credibility are properly left to the jury, and are not a proper subject of an Evidence Code section 402 hearing"]. See also *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) It is well-established that discrepancies in a witness's testimony generally provide no basis for rejecting the trial court's admissibility determination on appeal. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1040, 1052 ["Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding"].) Rather, in reviewing evidentiary rulings, we must not reweigh the evidence, and we must give the respondent, as the prevailing party, the benefit of all reasonable inferences drawn from such evidence. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco* (2004) 116 Cal.App.4th 1253, 1257-1258.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'[Citations.]" (*Id*. at p. 1279.)

We thus conclude the trial court acted within the broad scope of its broad discretion in determining the probative value of Stanley's testimony outweighed any risk of undue prejudice resulting from its admission.[31] In light of the testimony's relevance when viewed in a light most favorable to affirming the judgment, we uphold the trial court's decision to admit it. (See *People v. Pelayo* (1999) 69 Cal.App.4th 115, 120-121.)

---

[31] Defendant contends the trial court failed to evaluate this evidence pursuant to Evidence Code section 352, and thereby violated his due process rights. However, we decline to assume, in the absence of any evidence, that the trial court neglected its legal duty in this regard. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [reviewing court must presume the trial court properly followed the law in the absence of contrary evidence].)

And finally, even if we were to assume for the sake of argument that admission of Stanley's testimony was erroneous, there is no basis on this record for concluding defendant was thereby harmed. The testimony was brief, and related to a relatively minor act of domestic abuse by defendant against Alonzo. As such, there is little, if any, likelihood that, absent the testimony, defendant would have achieved a better result.

### D. Admission of Statements Containing Multiple Layers of Hearsay.

Defendant contends the trial court further committed prejudicial error by admitting certain multiple-hearsay statements. Specifically, defendant challenges the admission of testimony by Sergeant Longmire that an unidentified person told him a man named Darryl White told a man named George Hill that defendant killed Alonzo. In overruling defense counsel's multiple-hearsay objection, the trial court instructed the jury that Sergeant Longmire's statements were not admitted as evidence of the truth of defendant's guilt, but rather as evidence related to his investigation and, in particular, his investigative decision to show defendant a photograph of Darryl White in order to gauge his reaction.[32]

Defense counsel thereafter moved for a mistrial, arguing that Sergeant Longmire's testimony was "incredibly improper and it was designed only to inflame the jury with improper multiple levels of hearsay where this officer knows that none of this was borne out. [¶] [Sergeant Longmire] attempted, according to his reports, to interview Mr. Hill, to try to find Darryl Walker [sic], to ask George Hill to tape Darryl White — not Mr. Walker — to see if this could be confirmed. None of that ever came through. To ask a question about what [his] subsequent conduct was based on four levels of hearsay to inflame this jury is improper hearsay and I'm asking for a mistrial."

The trial court denied defense counsel's request for mistrial after considering further argument. The court did, however, invite defense counsel to submit a special jury instruction with respect to Sergeant Longmire's testimony for its consideration, which defense counsel does not appear to have done.

---

[32]     According to Sergeant Longmire, when defendant saw this photograph, he stated: "I'm starting to see what this is all about now."

The governing law is not in dispute. Where an objection is raised, unless the parties stipulate otherwise, hearsay evidence is generally inadmissible at trial subject to specific statutory exceptions. (Evid. Code, § 1200; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1354.) "Under Evidence Code section 1201, where a statement involves multiple levels of hearsay, each level must satisfy a hearsay exception in order for the entire statement to be admissible." (*Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 366.) Moreover, in satisfying the hearsay exception, the burden is placed squarely on the statement's proponent (to wit, the prosecution). (*Ibid.*) However, even where hearsay evidence is erroneously admitted or excluded, such error requires reversal of the final judgment only if the challenging party establishes that a miscarriage of justice has resulted. (Cal. Const., art. VI, § 13; Evid. Code, § 353.)

Here, the prosecution contends the challenged testimony by Sergeant Longmire was properly admitted nonhearsay evidence that was more probative than prejudicial. "An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute. (*People v. Armendariz* (1984) 37 Cal.3d 573, 585 [209 Cal.Rptr. 664, 693 P.2d 243; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1204-1205 [249 Cal.Rptr. 71, 756 P.2d 795]; see *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907 [179 Cal.Rptr. 61 [' "one important category of nonhearsay evidence — evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." '].)" (*People v. Turner* (1994) 8 Cal.4th 137, 189.)

According to the prosecution, Sergeant Longmire's testimony was admitted, not to prove its underlying truth, but to prove certain aspects of his investigatory work, such as the reasonableness and good-faith nature of his decisions to show defendant Darryl White's photograph and, more generally, to continue to investigate defendant despite the lapse in time since Alonzo's disappearance. (See *People v. Samuels* (2005) 36 Cal.4th

39

96, 122) [an out-of-court statement properly admitted to explain the witness's subsequent actions].) The prosecution also insists this "non-hearsay evidence" was more probative than prejudicial for purposes of Evidence Code section 352, reasoning that: "People are generally familiar with the police receiving tips as part of their investigation, and the jury was likely to interpret Longmire's testimony as just that, rather than jumping to the conclusion that it indicated evidence of guilt that had been withheld from them."

Having considered the record at hand in light of the governing law, we reject the prosecution's reasoning. Evidence that Darryl White told George Hill who told someone else who then told Sergeant Longmire that defendant killed Alonzo may have been marginally useful to explain why the detective focused his investigation on defendant after more than two years passed since her disappearance. However, contrary to the prosecution's claim, there is no real suggestion in this case that the police, including Sergeant Longmire, continued to investigate defendant in connection with Alonzo's disappearance for any non-legitimate reason such as "personal animus." The key issues were simply whether Alonzo was dead and whether defendant killed her. Sergeant Longmire's testimony about what he heard through the grapevine from Darryl White, when considered for a purpose other than truth, is not significantly probative on these issues. Moreover, while it may be true that defense counsel's strategy at trial was to attack the quality and completeness of Sergeant Longmire's investigation, we nonetheless question whether there was any real need by the prosecution to rely on this particular testimony by Sergeant Longmire in pursuing this strategy. (See *People v. Scalzi, supra,* 126 Cal.App.3d at p. 907; *People v. Livingston* (2012) 53 Cal.4th 1145, 1162-1163.)

Accordingly, we conclude that, even assuming Sergeant Longmire's testimony shed some light on the issue of police competence, its probative value was substantially outweighed by the probability of undue prejudice, or danger of confusing or misleading the jury. As aptly noted in a well-known evidentiary treatise: "One area where abuse may be a particular problem involves statements by arresting or investigating officers regarding the reason for their presence at the scene of a crime. The officers should not be put in the misleading position of appearing to have happened upon the scene and

40

therefore should be entitled to provide some explanation for their presence and conduct. They should not, however, be allowed to relate historical aspects of the case, such as complaints and reports of others containing inadmissible hearsay. Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this evidence is slight, and the likelihood of misuse great. Instead, a statement that an officer acted 'upon information received,' or words to that effect, should be sufficient." (2 McCormick, Evidence (7th ed. 2013) Hearsay, § 249, pp. 193-195.)

Here, while the jury was indeed apprised of the nonhearsay purpose for introducing this testimony, the fact remains that it was powerfully incriminating while only marginally probative. Indeed, this evidence, through the vessel of a chain of unconfirmed statements, directly identified defendant as Alonzo's killer. Accordingly, we conclude the trial court's decision to admit this evidence at trial was wrong.

However, in light of our reversal of this case on other grounds, we need not determine for purposes of this appeal whether it is reasonably probable the verdict would have been more favorable to defendant had Sergeant Longmire not testified that an unidentified person told him that Darryl White told George Hill that defendant killed Alonzo. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.) Accordingly, we simply point out the court's error in this regard, while reversing the judgment for prejudicial error in excluding third-party culpability evidence, a matter discussed at length above.

**DISPOSITION**

For the reasons set forth above, the judgment is reversed and the matter is remanded to the trial court for a new trial in accordance with the conclusions reached herein.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.